**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 94-30680

BETH PEDERSON; LISA OLLAR; SAMANTHA CLARK, Individually and on behalf of all others similarly situated,

Plaintiffs-Appellants,

versus

LOUISIANA STATE UNIVERSITY; WILLIAM E. DAVIS, Individually and in his official capacity as Chancellor of Louisiana State University; JOE C. DEAN; ELAINE D. ABELL; CLARENCE L. BARNEY; MILTON C. CHAPMAN; ELENORA A. CAWTHON; DAVID CONROY; CHARLES V. CUSIMANO; GORDON E. DORE; JANICE M. FOSTER; JIMMY A. LALONDE, JR.; JOSEPH LESAGE, JR.; ROLFE MCCOLLISTER, JR.; ROGER H. OGDEN; NICHOLAS SMITH, JR.; JOSEPH L. WAITZ; CHARLES S. WEEMS, III; JOHN R. WILLIAMS; MILTON J. WOMACK; ALL DEFENDANTS

Defendants-Appellees.

No. 95-30777

BETH PEDERSON; LISA OLLAR; SAMANTHA CLARK, Individually and on behalf of all others similarly situated

Plaintiffs-Appellants,

CINDY PINEDA; KARLA PINEDA

Intervenor Plaintiffs-Appellants,

versus

LOUISIANA STATE UNIVERSITY; WILLIAM E. DAVIS, Individually and in his official capacity as Chancellor of Louisiana State University; JOE C. DEAN; ELAINE D. ABELL; CLARENCE L. BARNEY; MILTON C. CHAPMAN; ELENORA A. CAWTHON; DAVID CONROY; CHARLES V. CUSIMANO; GORDON E. DORE; JANICE M. FOSTER; JIMMY A. LALONDE, JR.; JOSEPH LESAGE, JR.; ROLFE MCCOLLISTER, JR.; ROGER H. OGDEN; NICHOLAS SMITH, JR.; JOSEPH L. WAITZ; CHARLES S. WEEMS, III; JOHN R. WILLIAMS; MILTON J. WOMACK; ALL DEFENDANTS

Defendants-Appellees.

---

No. 96-30310

---

BETH PEDERSON; LISA OLLAR; SAMANTHA CLARK, Individually and on behalf of all others similarly situated

Plaintiffs-Appellants,

versus

LOUISIANA STATE UNIVERSITY; WILLIAM E. DAVIS, Individually and in his official capacity as Chancellor of Louisiana State University; JOE C. DEAN; ELAINE D. ABELL; CLARENCE L. BARNEY; MILTON C. CHAPMAN; ELENORA A. CAWTHON; DAVID CONROY; CHARLES V. CUSIMANO; GORDON E. DORE; JANICE M. FOSTER; JIMMY A. LALONDE, JR.; JOSEPH LESAGE, JR.; ROLFE MCCOLLISTER, JR.; ROGER H. OGDEN; NICHOLAS SMITH, JR.; JOSEPH L. WAITZ; CHARLES S. WEEMS, III; JOHN R. WILLIAMS; MILTON J. WOMACK; ALL DEFENDANTS

Defendants-Appellees.

---

No. 97-30427

---

BETH PEDERSON; LISA OLLAR; SAMANTHA CLARK, Individually and on behalf of all others similarly situated

Plaintiffs-Appellees,

CINDY PINEDA; KARLA PINEDA

Plaintiffs-Appellees,

versus

LOUISIANA STATE UNIVERSITY; WILLIAM E. DAVIS; JOE C. DEAN; ELAINE D. ABELL; CLARENCE L. BARNEY; MILTON C. CHAPMAN; ELENORA A. CAWTHON; DAVID CONROY; CHARLES V. CUSIMANO; GORDON E. DORE; JANICE M. FOSTER; JIMMY A. LALONDE, JR.; JOSEPH LESAGE, JR.; ROLFE MCCOLLISTER, JR.; ROGER H. OGDEN; NICHOLAS SMITH, JR.;

2

JOSEPH L. WAITZ; CHARLES S. WEEMS, III; JOHN R. WILLIAMS; MILTON J. WOMACK; ALL DEFENDANTS

                                    Defendants-Appellants.

                            _____

                              No. 97-30719

                            _____


BETH PEDERSON; LISA OLLAR; SAMANTHA CLARK, Individually and on behalf of all others similarly situated

                                    Plaintiffs-Appellants,

CINDY PINEDA; KARLA PINEDA

                              Plaintiffs-Appellants-Appellees,

                              versus

LOUISIANA STATE UNIVERSITY; WILLIAM E. DAVIS, Individually and in his official capacity as Chancellor of Louisiana State University; JOE C. DEAN; ELAINE D. ABELL; CLARENCE L. BARNEY; MILTON C. CHAPMAN; ELENORA A. CAWTHON; DAVID CONROY; CHARLES V. CUSIMANO; GORDON E. DORE; JANICE M. FOSTER; JIMMY A. LALONDE, JR.; JOSEPH LESAGE, JR.; ROLFE MCCOLLISTER, JR.; ROGER H. OGDEN; NICHOLAS SMITH, JR.; JOSEPH L. WAITZ; CHARLES S. WEEMS, III; JOHN R. WILLIAMS; MILTON J. WOMACK; ALL DEFENDANTS

                              Defendants-Appellees-Appellants.

                      _____

                Appeals from the United States District Court
                  for the Middle District of Louisiana

                      _____

                          January 27, 2000

Before KING, Chief Judge, and STEWART, Circuit Judge, and LITTLE, District Judge.[*]

CARL E. STEWART, Circuit Judge:

     We must today determine whether the largest public university

in Louisiana has discriminated against women under Title IX in the

_____

     [*] District Judge of the Western District of Louisiana, sitting by designation.

                                 3

provision of facilities and teams for intercollegiate athletic competition. Before us are eight appeals, which were consolidated for briefing and argument, concerning allegations of such discrimination against the instant plaintiffs and a putative class of female undergraduates at Louisiana State University ("LSU"). After threading our way through issues relating to class certification and subject matter jurisdiction, we conclude that LSU violated Title IX by failing to accommodate effectively the interests and abilities of certain female students and that its discrimination against these students was intentional.

## I. Procedural & Factual History

On March 23, 1994, three female undergraduate students attending LSU—Beth Pederson, Lisa Ollar, and Samantha Clark ("Pederson Plaintiffs")-filed suit in the United States District Court for the Middle District of Louisiana, alleging that LSU had violated and continued to violate Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681-1688 (1994) ("Title IX"), and the Equal Protection Clause of the United States Constitution by denying them equal opportunity to participate in intercollegiate athletics, equal opportunity to compete for and to receive athletic scholarships, and equal access to the benefits and services that LSU provides to its varsity intercollegiate athletes, and by discriminating against women in the provision of athletic scholarships and in the compensation paid coaches.[1] The Pederson

---

[1] Pederson, Ollar, and Clark all play soccer. Pederson enrolled at LSU beginning in the autumn term of 1992. Ollar enrolled at LSU beginning with the autumn term of 1990. Clark

Plaintiffs sought declaratory, injunctive, and monetary relief on behalf of themselves and all those similarly situated. The defendants to the action included LSU, Athletic Director Joe Dean (in his individual and official capacities) ("Dean"), Chancellor William E. Davis (in his individual and official capacities) ("Davis"), and the individual members of the LSU Board of Supervisors (in their official capacities only) (collectively, "Appellees").[2]

Subsequently, plaintiffs Cindy and Karla Pineda ("Pineda Plaintiffs" and, together with Pederson Plaintiffs, "Appellants") sought to intervene in the original action.[3] The motion to intervene was denied, and the Pineda Plaintiffs filed suit on behalf of themselves and a class of those similarly situated in the Eastern District of Louisiana on January 3, 1995. Appellees transferred the Pineda action to the Middle District of Louisiana

---

enrolled at LSU beginning in the autumn term of 1990 through December 1994. The district court found that, when LSU implemented a soccer team in the autumn term of 1995, Pederson tried out for and made the team but ultimately did not participate because of financial difficulties and lack of necessary skill, and Ollar and Clark did not participate because they had no remaining college eligibility.

[2] An exhaustive summary of the facts underlying this case and a more thorough procedural history may be found at Pederson v. Louisiana State Univ., 912 F. Supp. 892, 897-902 (M.D. La. 1996). In this opinion, we repeat only those aspects of the case necessary to our disposition and refer the reader to the district court's opinion for a fuller record of the events.

[3] The Pineda Plaintiffs play fast-pitch softball. Cindy and Karla Pineda both enrolled at LSU beginning in the Autumn of 1992. When LSU implemented a softball team at the intramural level, Karla participated in the league. When LSU implemented a varsity fast-pitch softball team for the 1996-97 season, Cindy tried out for and made the team as a scholarship player.

and moved to consolidate the Pineda action with the Pederson action.  The district court granted the motion, and Appellants filed an amended complaint merging the actions.

In the course of the litigation, the district court denied Appellants' motions for preliminary injunctions.  On September 14, 1995, it granted Appellees' motion for partial summary judgment, dismissing for lack of standing Appellants' claims for equal treatment in the areas of coaches' salaries, budgets, facilities, training, and travel, on the ground that Appellants could not demonstrate injury-in-fact related to existing varsity athletic programs in which they had never sought to participate.[4]  On the same date, the district court dismissed Appellants' 42 U.S.C. § 1983 claims against defendants Davis and Dean in their individual

---

[4] Alleged violations of Title IX in the area of athletics are often divided into effective accommodation claims and equal treatment claims.  The distinction is derived from the regulations promulgated under Title IX.  Effective accommodation claims correspond to the portion of the implementing regulations that

> provide that in determining whether equal athletic opportunities for members of both sexes are available, the Office of Civil Rights of the Department of Education (the office charged with enforcement of Title IX) will consider, among other factors, "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes."

Boucher v. Syracuse Univ., 164 F.3d 113, 115 n.1 (2d Cir. 1999) (quoting 34 C.F.R. § 106.41(c)(1)).  Equal treatment claims "derive from the Title IX regulations found at 34 C.F.R. §§ 106.37(c) and 106.41(c)(2)-(10), which call for equal provision of athletic scholarships as well as equal provision of other athletic benefits and opportunities among the sexes."  Id. at 115 n.2.

6

capacities on the basis of qualified immunity, and also dismissed the remaining § 1983 and Fourteenth Amendment claims.  The district court also entered an order provisionally certifying the following class:

> Those female students enrolled at LSU since 1993 and any time thereafter who have sought or seek to participate in varsity intercollegiate athletics at LSU but who are or were not allowed such participation due to LSU's failure to field teams in said female varsity athletics.

The district court conducted trial on Appellants' surviving claims from October 10, 1995, through November 8, 1995.  On January 11, 1996, the district court entered an order decertifying the class because the numerosity requirement of Federal Rule of Civil Procedure 23(a) ("Rule 23(a)") had not been met and because a class was not needed to obtain the requested relief.  On January 12, 1996, the district court entered its opinion on the merits finding that Appellees were in violation of Title IX.  See Pederson v. Louisiana State Univ., 912 F. Supp. 892, 917 (M.D. La. 1996).  The district court ruled, however, that Appellees did not intentionally violate Title IX and therefore would not be liable for monetary damages.  The district court also dismissed the claims of the Pederson Plaintiffs for lack of standing.  As a result of its finding that Appellees were in violation of Title IX, the district court ordered Appellees to submit a plan for compliance with the statute (the "Compliance Plan").

The Pederson Plaintiffs filed a notice of appeal on January 12, 1996 from the district court's order.  The notice of appeal encompassed all prior district court orders.  On June 9, 1997, the

Pineda Plaintiffs filed a notice of appeal from the district court's May 9, 1997 order approving the Compliance Plan. The notice of the appeal encompassed all prior district court orders. On July 24, 1997, Appellants collectively filed a notice of appeal from the final judgment entered on July 1, 1997. In this consolidated appeal, Appellants challenge the district court's decision to decertify the class, the district court's conclusion that Appellees did not intentionally violate Title IX, the district court's decision to dismiss the Pederson Plaintiffs' claims for lack of standing, and the district court's conclusion that Appellants lacked standing to pursue their claims alleging a lack of equal treatment in existing LSU varsity sports.

Prior to the entry of final judgment against Appellees, the Supreme Court decided <u>Seminole Tribe v. Florida</u>, 517 U.S. 44 (1996). In their answer to both complaints, Appellees had pled the affirmative defense of Eleventh Amendment immunity. In light of <u>Seminole Tribe</u>, Appellees filed a Rule 12(b)(1) motion to dismiss on May 14, 1996, contending that Eleventh Amendment sovereign immunity deprived the court of subject matter jurisdiction. On March 4, 1997, the district court denied Appellees' motion. On March 19, 1997, Appellees filed a notice of appeal of the district court's denial of their 12(b)(1) motion. On June 9, 1997, Appellees appealed from the district court's May 9, 1997 order approving the Compliance Plan. The notice of appeal encompassed all of the district court's earlier rulings, including the district court's finding that LSU is or was in violation of Title IX. On

July 7, 1997, Appellees filed another notice of appeal from the final judgment entered on July 1, 1997. On appeal, Appellees challenge the district court's denial of their 12(b)(1) motion to dismiss, the district court's conclusion that Appellees were in violation of Title IX, and the district court's ordered injunctive relief on the ground that it is overbroad.

## II. Jurisdiction

We begin our analysis by determining our jurisdiction to entertain these appeals. We must address the jurisdictional issues of standing, mootness, state sovereign immunity, and class certification; we address these issues in no particular order.[5] We proceed, first, by reviewing the district court's decision to decertify the class it provisionally certified on September 14, 1995. Next, with regard to standing, we determine whether the district court correctly determined that the Pederson Plaintiffs lacked standing to pursue their claims and whether it correctly determined that Appellants lacked standing to pursue their claims of unequal treatment in existing varsity sports at LSU. Third, we examine Appellees' contentions regarding mootness. Finally, we

---

[5] When questions of both Article III jurisdiction and class certification are presented, the class certification questions, at times, "should be treated first because class certification issues are 'logically antecedent' to Article III concerns and pertain to statutory standing, which may properly be treated before Article III standing." Ortiz v. Fibreboard Corp., 119 S. Ct. 2295, 2300 (1999) (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 612 (1997) ) (internal citations omitted). Because the class certification issue presented here is not outcome determinative, as it was in both Ortiz and Amchem, it need not, in our minds, be treated first. We nonetheless begin by discussing the district court's decertification of the putative class.

9

determine whether the doctrine of sovereign immunity bars suit in this case.

## A. Class Decertification

We review a district court's class certification decisions for abuse of discretion.[6] See Shipes v. Trinity Indus., 987 F.2d 311, 316 (5th Cir. 1993); Merrill v. Southern Methodist Univ., 806 F.2d 600, 607 (5th Cir. 1986). "[T]he district court maintains great discretion in certifying and managing a class action. We will reverse a district court's decision to certify a class only upon a showing that the court abused its discretion, or that it applied incorrect legal standards in reaching its decision." Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 624 (5th Cir. 1999). The decision to decertify a provisionally certified class is a class certification decision and, as such, is reviewed for abuse of discretion. See Mooney v. Aramco Services Co., 54 F.3d 1207, 1212 (5th Cir. 1995); Briggs v. Anderson, 796 F.2d 1009, 1017 (8th Cir. 1986).

In the district court, Appellants sought to certify the class of "all LSU women students enrolled at any time since February, 1993 or who seek to enroll or become enrolled during the course of

---

[6] We review the district court's decertification of the class despite Appellees' contentions that this action is moot as to Appellants. Even if that contention holds true, Appellants are the proper parties to contest the district court's certification decisions regarding the putative class. See United States Parole Comm'n v. Geraghty, 445 U.S. 388, 404 (1980). Appellees also argue that the class claims are moot. We determine, infra, that they are not.

this litigation and who seek or have sought to participate and or were deterred from participating in varsity intercollegiate athletics funded by LSU."[7] Memorandum Ruling of Jan. 12, 1996, at 1. On September 14, 1995, the district court provisionally certified the class of "[t]hose who have sought or seek to participate in varsity intercollegiate athletics at LSU but who are or were not allowed such participation due to LSU's failure to field teams in said female varsity athletics." Id. at 4. At that time, the district court voiced its concern that the numerosity requirement of Rule 23(a) had not been met. The court stated:

> provisional certification will require plaintiffs, before judgment is rendered, to further support their assertion that the joinder of potential class members is impracticable. . . . In particular this Court is concerned that plaintiffs cannot show that one major argument on numerosity is causally weak, i.e. whether women who participate in intermurals [sic] at LSU

---

[7] In order to maintain a class action, plaintiffs must first show that the four requirements Rule 23(a) have been met and, additionally, that one of the requirements of Rule 23(b) have been met. See FED. R. CIV. P. 23. The requirements of Rule 23(a) are

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Id. 23(a). The district court initially certified a class under Rule 23(b)(2), which allows a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Id. 23(b)(2). Appellants contend that they reserved the right to move for certification under Rule 23(b)(3), but the Appellees dispute this contention. We take no position on this debate because no appeal was filed with respect to the certification of a Rule 23(b)(3) class.

would have the ability or interests to compete at the varsity level at LSU.

Memorandum Ruling of Sept. 14, 1995, at 10-11.  Following the close of evidence at trial, both sides briefed the issue of numerosity.

Ultimately, the district court decertified the provisional class.  See Memorandum Ruling of Jan. 12, 1996, at 8-9.  It stated that it had "cautioned plaintiffs' counsel in its original ruling that the evidence presented on numerosity was not sufficient to uphold a class certification and granted plaintiffs the opportunity to bolster that information. [It] remain[ed] unconvinced that such numerosity exists."[8]  Id. at 4-5.

Appellants challenge the decertification of the putative class.  It is important for our purposes to recognize that Appellants do not challenge the district court's redefinition of the putative class; they merely challenge the district court's decision to decertify the redefined class.[9]  The precise question before us, therefore, is whether the district court abused its discretion when it decertified, on the grounds of lack of

---

[8] The district court then established "lack of necessity" as an alternative ground for decertifying the class.  This court has, in the past, declined to decide whether necessity can play a role in class certification decisions.  See Johnson v. City of Opelousas, 658 F.2d 1065, 1069-70 (5th Cir. 1981).  We again decline to decide this question.  We simply decide that, if indeed a necessity requirement exists, the substantial risk of mootness here created a necessity for class certification in this case, and the district court abused its discretion in finding no necessity for a class.

[9] Appellants assert in their brief before this court a desire to represent the class they originally proposed to the district court, but they fail to challenge the district court's redefinition of the putative class.

12

numerosity and lack of necessity, the class of "[t]hose female students enrolled at LSU since 1993 and any time thereafter who have sought or seek to participate in varsity intercollegiate athletics at LSU but who are or were not allowed such participation due to LSU's failure to field teams in said female varsity athletics." Memorandum Ruling of Jan. 12, 1996, at 4.

Appellants' major contention appears to be that the evidence presented at trial clearly satisfied the numerosity requirement and that the district court's decertification order, therefore, erroneously assessed that evidence. Appellants also attack the district court's failure to make specific findings of fact in its memorandum ruling decertifying the putative class. See Appellants' Brief at 34-35 ("Although the District Court (contrary to Rules 23 and 52) made no factual findings supporting its holding as to numerosity, the trial evidence clearly established the numerosity element.").

The district court made clear that its decertification decision, in all aspects relevant to this discussion, rested on Appellants' inability to satisfy the numerosity requirement. Moreover, in its September 14, 1995, Memorandum Ruling, the district court explained that Appellants had failed to provide evidence that members of the intramural and club teams had the desire or ability to compete at the varsity level. Appellants are correct, however, that the district court failed to identify specific findings of fact to support its conclusion that the numerosity requirement had not been met. Both parties briefed the

numerosity issue following the close of evidence at trial.  These briefs detailed the evidence in favor of and against a conclusion that the numerosity prong of Rule 23(a) had been satisfied.  This same evidence is reiterated in the briefs prepared on appeal.

At trial, Appellants established that a number of current LSU female students had a desire to try out for varsity soccer or fast-pitch softball.[10]  Appellees admit that eight people showed up for varsity soccer tryouts.  These eight, however, do not constitute the sum total of class members.  The class consists of all "female students enrolled at LSU since 1993 and any time thereafter" who wish to participate.  Plaintiffs established that, around the time of trial, well over 5,000 young women were playing soccer or fast-pitch softball at the high school level in Louisiana.  They also established that many former members of a Baton Rouge soccer club received scholarships to play intercollegiate soccer. As Appellees point out, these women, because they are not students at LSU, are not members of the putative class.  However, considering the talent pool in Louisiana established by these figures and the number of LSU students who come from Louisiana, Appellants have established that numerous future female LSU students will desire to try out for varsity soccer and fast-pitch softball.  To satisfy the numerosity prong, "a plaintiff must ordinarily demonstrate some evidence or

---

[10] Because we determine, infra, that to establish standing, an individual need only demonstrate that she is able and ready to compete for a position on the unfielded team, we do not focus, as the district court seems to have, on whether potential class members have the skill necessary to obtain a position on a varsity team.

14

reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981). The evidence presented brings Appellants' assertions as to numerosity beyond the "mere allegation that the class is too numerous to make joinder practicable" which, by itself, is insufficient. *Fleming v. Travenol Laboratories, Inc.*, 707 F.2d 829, 833 (5th Cir. 1983).[11]

Our independent review of the record satisfies us that the numerosity prong has been satisfied. Because the district court failed to identify specific findings that led it to conclude that the numerosity prong had not been satisfied, we can only conclude that its assessment of the evidence was clearly erroneous and, therefore, that it abused its discretion in declining finally to certify the putative class on the ground of lack of numerosity. Accordingly, we vacate the district court's decertification order.

It has been over four years since the district court provisionally certified the class at issue. While we have

---

[11] We have previously stated that when conducting a numerosity analysis, district courts must not focus on sheer numbers alone but must instead focus "on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors." *Phillips v. Joint Legislative Comm.*, 637 F.2d 1014, 1022 (5th Cir. 1981). We have found the inclusion of future members in the class definition a factor to consider in determining if joinder is impracticable. In *Jack v. American Linen Supply Co.*, we noted that "[t]he alleged class . . . include[d] unnamed, unknown future . . . [members] who will be affected by . . . discriminatory policies, and joinder of unknown individuals is certainly impracticable." 498 F.2d 122, 124 (5th Cir. 1974). In the case at hand, the fact that the class includes unknown, unnamed future members also weighs in favor of certification.

15

determined that the district court abused its discretion in decertifying the class on the grounds of numerosity and, possibly, lack of need, this court is not as well situated as the district court to determine whether the putative class should now finally be certified given all other considerations that go into a class certification decision. Upon remand, therefore, the district court should reconsider final class certification in light of this opinion and all other class certification considerations, including the adequacy as a representative of any person who hereafter comes forward to represent the class.

## B. Standing

The district court ruled that the Pederson Plaintiffs lacked standing to bring suit for violations of Title IX and that all Appellants lacked standing to challenge LSU's existing varsity program. We review each ruling in turn.

## 1. Legal Principles

"Jurisdictional questions are questions of law, and thus reviewable de novo by this Court. . . . If the district court resolves any factual disputes in making its jurisdictional findings, the facts expressly or impliedly found by the district court are accepted on appeal unless the findings are clearly erroneous." In the Matter of the Complaint of Tom-Mac, Inc., 76 F.3d 678, 682 (5th Cir. 1996) (internal citations omitted). "A question of standing raises the issue of whether the plaintiff is entitled to have the court decide the merits of the dispute or of particular issues. Standing is a jurisdictional requirement that

focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." Cook v. Reno, 74 F.3d 97, 98-99 (5th Cir. 1996) (internal quotations and footnotes omitted).

> To have standing, a plaintiff must establish three elements:
>
> First, the plaintiff must show that it has suffered an injury in fact--a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical. Second, the plaintiff must establish causation–a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. Lastly, there must be redressability--a likelihood that the requested relief will redress the alleged injury.

Sierra Club v. Peterson, 185 F.3d 349, 360 (5th Cir. 1999). Additionally, courts have refused to adjudicate cases that raise only generalized grievances. "A generalized grievance is a harm shared in substantially equal measure by all or a large class of citizens. The prudential principle barring adjudication of generalized grievances is closely related to the constitutional requirement of personal injury in fact, and the policies underlying both are similar." Walker v. Mesquite, 169 F.3d 973, 979 n.16 (5th Cir. 1999) (internal citations and quotation marks omitted).

Finally, the doctrine of standing is distinguishable from that of mootness. The Supreme Court has acknowledged "mootness as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980) (quoting Monaghan, Constitutional Adjudication: The Who and When, 82 YALE L.J. 1363, 1384 (1973)).

17

## 2. Pederson Plaintiffs

The district court determined that the Pederson Plaintiffs--Pederson, Ollar, and Clark--lacked standing to bring claims for equitable or declaratory relief. With regard to Ollar and Clark, the court found that they "were ineligible to compete in intercollegiate athletics after May, 1995 under the regulations of the National Collegiate Athletic Association [("NCAA")]." Pederson, 912 F. Supp. at 907. The court found that Pederson retained NCAA eligibility and had made the team, but she quit the team for financial reasons and was, at the same time, cut from the team due to a lack of skill. Id. at 907 & n.34. The court further found that LSU had no men's varsity soccer team and that it provided men and women the same opportunity to participate in club soccer. Finally, the court found that the Pederson Plaintiffs did not establish the ability to play soccer above the club level and that they did not establish the interest or ability to play any sport other than soccer. The court therefore concluded that "LSU's alleged violation of Title IX by not providing additional athletic opportunity to its female students in no way personally impacted these three plaintiffs." Id. at 907. Absent any personal impact, the court determined that the Pederson Plaintiffs lacked standing and dismissed their claims.

The district court failed appropriately to evaluate the Pederson Plaintiffs' standing. First, the district court addresses each plaintiff's NCAA eligibility at the time of trial. Eligibility at the time of trial, however, implicates mootness; it

18

has no bearing on the particular litigant's standing at the time the suit was filed.[12]

Second, the district court's conclusion that LSU provided men and women the same opportunities to play soccer and that, therefore, LSU's Title IX violation did not impact the Pederson Plaintiffs reaches the merits of the Pederson Plaintiffs' effective accommodation claim. The Pederson Plaintiffs claim that LSU, by failing to field a women's varsity soccer team, ineffectively accommodated the interests and abilities of female students at the school. Whether or not the Pederson Plaintiffs produced evidence at trial sufficient to establish this alleged violation is the very heart of the matter in their case and does not implicate standing. Standing requires alleged misconduct, not proven misconduct. To the extent that the district court reached the merits of the Pederson Plaintiffs' claims in its opinion, we remark only that "[i]t is inappropriate for the court to focus on the merits of the case when considering the issue of standing." Hanson v. Veterans Admin., 800 F.2d 1381, 1385 (5th Cir. 1986).

Third, the district court misconceived the level of injury necessary to establish standing in this area. The district court's focus on the ability of each Pederson Plaintiff to secure a position on the varsity soccer team was misplaced. This inquiry will be appropriate in the determination of damages during Stage II. If the Pederson Plaintiffs have standing and succeed on their violation claims, then each plaintiff's ability to secure a

---

[12] We discuss mootness in Part II.C., infra.

position on the unfielded varsity soccer team during the period of the violation is a factor to consider in assessing damages. Of course, each plaintiff's ability to secure a position will be impacted both by skill and NCAA eligibility. The findings of the district court, therefore, do not help to determine whether the Pederson Plaintiffs have standing to challenge LSU's effective accommodation under Title IX, i.e., whether they met the minimum standing requirements at the time they instituted this suit.

We are unaware of, nor does either party point to, precedent delineating the precise level of injury a litigant must demonstrate to establish standing to assert a claim under Title IX for ineffective accommodation. Clearly, the alleged misconduct here is LSU's failure to field a varsity soccer team in violation of Title IX. The remedies sought are both monetary and injunctive. As a general matter, injury in fact is the "invasion of a legally protected interest." Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 663 (1993). The difficult question, then, is whether there is, in this case, any legally protected interest actually violated or in imminent danger of being violated that is fairly traceable to the alleged misconduct and from which the Pederson Plaintiffs will likely obtain relief as a result of a favorable ruling. The district court seems to require that the Pederson Plaintiffs allege the injury of being denied the opportunity to compete on a specific varsity team. It follows from this reasoning that a determination that a plaintiff would not have made the specific varsity team,

even had it existed, defeats her standing because she fails to demonstrate sufficient injury. The district court requires too much.

Our decision here is informed on two fronts. First, we find the case of <u>Boucher v. Syracuse Univ.</u>, 164 F.3d 113 (2d Cir. 1999) supportive. There, members of the club lacrosse and softball teams brought suit for violation of Title IX. Neither the district court nor the Court of Appeals for the Second Circuit discussed whether any of the students possessed the skills necessary to make one of the unfielded varsity teams. Nonetheless, the Second Circuit, after dismissing their equal treatment claims for lack of standing, never even questioned their standing to bring effective accommodation claims. <u>See</u> <u>id.</u> at 120.

Second, we find the Supreme Court's Equal Protection jurisprudence instructive. In the context of set-aside programs, the Court has stated:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. And in the context of a challenge to a set-aside program, the "injury in fact" is the inability to compete on an equal footing in the bidding process, not the loss of a contract. To establish standing, therefore, a party challenging a set-aside program . . . need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis.

<u>Northeastern Florida</u>, 508 U.S. at 666 (citations omitted). Violating Title IX by failing to field women's varsity teams that

21

effectively accommodate the interests and abilities of the university community certainly creates a barrier for female students. In much the same way as set-aside programs, the injury here results from the imposed barrier–the absence of a varsity team for a position on which a female student should be allowed to try out. We hold, therefore, that to establish standing under a Title IX effective accommodation claim, a party need only demonstrate that she is "able and ready" to compete for a position on the unfielded team.

The Pederson Plaintiffs have certainly established standing in this case. They all participated in club soccer, and, indeed, Pederson actually competed for a spot on the team once it was fielded. Whether or not they have proved sufficiently their claims on the merits, however, is for the district court to decide. The district court's conclusion that Appellees violated Title IX by failing to field a women's varsity fast-pitch softball team does not compel a conclusion that they likewise violated Title IX by failing to field a women's varsity soccer team. Upon remand, the district court should determine, prior to proceeding to Stage II, the merits of the Pederson Plaintiffs' claim.

### 3. Unequal Treatment Claims

Appellants also challenge the district court's determination that they did not have standing to challenge LSU's entire varsity athletic program as it then existed, including the allocation of scholarships and other benefits to varsity athletes. They argue that the district court should not have dismissed their claims for

22

declaratory and injunctive relief with respect to women's varsity basketball, volleyball, track, tennis, golf, gymnastics, and swimming because they have individually sustained the requisite injury necessary to address the operation of LSU's athletic program as a whole, and because limiting the inquiry to specific teams contradicts the policies of Title IX as well as traditional notions of fairness.

The district court found that Appellants had standing to challenge the lack of effective accommodation but not the denial of equivalence in other athletic benefits. Appellees defend the district court's conclusion on the ground that persons who never participated in intercollegiate athletics have no standing to challenge the treatment of existing athletes.

We agree with the district court that Appellants lack standing to challenge the alleged unequal treatment of varsity athletes at LSU. At the time of trial, no named plaintiff was a member of a varsity team.[13] Moreover, the class that Appellants seek to represent includes women injured by LSU's failure to field teams for certain sports. Standing to challenge effective accommodation does not automatically translate into standing to challenge the treatment of existing varsity athletes. See Boucher, 164 F.3d at 116 ("The [district] court held that since none of the named

---

[13] We do not mean to imply that an equal treatment claim can only be brought by an existing varsity athlete. Whether, for example, a female student who was deterred from competing for a spot on an existing varsity team because of perceived unequal treatment of female varsity athletes would have standing to challenge the existing varsity program is a question we leave for another day.

23

plaintiffs were varsity athletes, they did not have standing to assert the equal treatment claims.  Its ruling on this issue was proper and we affirm the dismissal of plaintiffs' equal treatment claims . . . .").  Because we agree substantially with the reasoning set forth by the district court in its September 14, 1995, Memorandum Ruling, for further explanation we rely on the district court's discussion.[14]

---

[14] The district court stated:

> If she [plaintiffs] cannot show personal injury, then no Article III case or controversy exists, and a Federal Court is powerless to hear that grievance.  The individual injury requirement is not met by alleging "that injury has been suffered by other, unidentified members of the class to which [the plaintiff] belong[s] and which she purports to represent." Warth v. Seldin, 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975).  Accordingly, a named plaintiff in a class action who cannot establish the requisite case or controversy between him or herself and the defendants simply cannot seek relief for anyone...not for herself, and not for any other member of the class.  O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974)...The treatment of participants in female varsity athletics has not impacted plaintiffs as they have not been female varsity athletes and therefore have not been discriminated against by any alleged treatment of LSU's female varsity athletes; therefore a change in said treatment would not impact plaintiffs.  Plaintiffs have personally suffered no injury or threatened injury due to LSU's allegedly illegal treatment of its varsity athletes and as such fail the initial prong of the standing inquiry as to the claims for illegal treatment of athletes.

District Court Memorandum Ruling, September 14, 1995.

We note, additionally, that we would be unable to reach the merits of this claim even were Appellants to have standing.  We determined, supra, that the putative class is not properly certified, and we determine, infra, that the claims for injunctive relief have been rendered moot as to the named plaintiffs by reason of their graduation; because there is no proper party before us to raise this issue, we would be unable to reach the merits of it.  See Geraghty, 445 U.S. at 400 n.7, 404.

24

## C. Mootness

Appellees insist, at several points throughout their brief, that issues presented are moot as to the named plaintiffs and the class. Appellants seem to agree with this assertion, as least in relation to the injunctive claims asserted by the named plaintiffs. In their brief, Appellants state, "[The Pineda Plaintiffs'] graduation would render the issue [of injunctive relief] moot and thereby alleviate the requirement that LSU maintain a women's softball team . . . ." Appellants' Brief at 45. As to the class, Appellees assert that the district judge's order was "essentially class relief." Appellees' Brief at 76. They fault Appellants for failing to "argue in their brief that the compliance plan ordered by the District Court is deficient or that the plan does not bring LSU into compliance with respect to Title IX's effective accommodation requirements for participatory opportunities." Id. at 77. The gist of Appellees' argument is that the district court, in effect, ordered class relief; Appellants do not contest that relief; therefore, any class claims for injunctive relief are moot.

Appellees rely on Locke v. Board of Public Instruction, 499 F.2d 359 (5th Cir. 1974), for the proposition that the district court's acceptance of their Compliance Plan moots the class claims. In that case, a teacher sued her school district for race and sex discrimination surrounding her maternity leave. Before oral argument on appeal, the maternity policy was changed and Locke was transferred, at her own request, into a teaching position that she found satisfactory.

We noted there that "in her original complaint the only relief sought by Mrs. Locke other than money damages was an injunction restraining the school system from implementing its present leave policy <u>against the plaintiff</u> in a discriminatory manner." <u>Id.</u> at 363 (emphasis added). We went on to explain:

> It is clear from the facts before us . . . that the plaintiff herein has now been satisfied as to her request for a job complete with supplemental work and pay. The counsel for the school board . . . has assured this court that the school board always had, and still maintains, good will toward Mrs. Locke. Furthermore, it is clear that the school board has done everything within its power to comply with Mrs. Locke's wishes within the limitations placed upon the board by the various federal orders and mandates. This court is aware . . . that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the cases, i.e., does not make the case moot. But, the mootness in this case . . . depends not at all upon a voluntary cessation of activity, but rather depends on the simple fact that Mrs. Locke's wishes have been complied with and it is a matter of record that the school board is complying with the various federal mandates and orders as to integration of its school system. Even though . . . it could be argued that this is a question that is capable of repetition, here, . . . that is not possible. The maternity leave policy allegedly forced on Mrs. Locke is no longer in existence, a new one having taken its place on December 12, 1972. Mrs. Locke will never again be forced to comply with that leave policy.

<u>Id.</u> at 364 (internal quotation marks and citations omitted). Finally, we concluded that "although this matter has generated public concern, the nature of the case itself we find is that of a single individual alleging infringement of her rights. This does not make the dispute one of 'general public interest' requiring a decision even if many attributes of mootness exist." <u>Id.</u> at 366.

Appellants here have consistently maintained that the alleged Title IX violation impacts not only themselves, but many women at LSU. Furthermore, the fact that the district court ordered a

Compliance Plan demonstrates that the issues here go far beyond the impact of the alleged violations on the named plaintiffs. Finally, Appellees have failed to show the same dedication to accommodating the desires of Appellants that the school district in <u>Locke</u> demonstrated. <u>Locke</u> was rightly decided, but, without intending to put too fine a point on it, it is on all counts not the case before us today.

This appeal raises three merit-based questions. Appellees argue that the district court erred in its conclusion that LSU violated Title IX. Appellants argue that the district court erred in finding that Appellees did not discriminate intentionally. Finally, Appellees argue that the district court's Compliance Plan requirements were overly broad. The Title IX violation question is necessarily antecedent to the issue of intentional discrimination, and the intentional discrimination issue, as discussed <u>infra</u>, implicates Appellants' damages claim. The Compliance Plan question deals with the injunctive relief prayed for by Appellants. "Justiciability must be analyzed separately on the issues of money damages and the propriety of equitable relief." <u>Henschen v. City of Houston</u>, 959 F.2d 584, 587 (5th Cir. 1992). We, therefore, analyze separately the mootness of the injunctive claims and the damages claims. Furthermore, we examine mootness as to the named plaintiffs and the putative class. "The starting point for analysis is the familiar proposition that 'federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them.'" <u>DeFunis v. Odegaard</u>, 416 U.S.

312, 316 (1974) (quoting <u>North Carolina v. Rice</u>, 404 U.S. 244, 246 (1971)).

## 1. Injunctive Relief

In the present case, Appellants have all graduated from LSU. Even assuming that any one of them retains any NCAA eligibility at this point, they have not argued that there is any likelihood that any of them will return to LSU and attempt to play varsity sports. As is so often the case in suits for injunctive relief brought by students, graduation or impending graduation renders their claims for injunctive relief moot. <u>See</u> <u>Id.</u> at 319-20; <u>Sapp v. Renfroe</u>, 511 F.2d 172, 175 (5th Cir. 1975). Because the named plaintiffs will not benefit from a favorable ruling on the question implicating injunctive relief, we hold that this question is moot as to them.

The issue of injunctive relief, however, is not moot as to the putative class. Appellees argue that the district court's effective class relief and their compliance with Title IX, based upon a plan entered into before this litigation began, renders the issue of injunctive relief moot as to the putative class as well. Contrary to Appellees' assertions, it is well established that the

> voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot. But jurisdiction, properly acquired, may abate if he case becomes moot because (1) it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.
>
> When both conditions are satisfied it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law.

28

The burden of demonstrating mootness is a heavy one. County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (internal citations and quotation marks omitted). In this case, Appellees bear the burden of demonstrating that "'there is no reasonable expectation that the wrong will be repeated.'" ACLU v. Finch, 638 F.2d 1336, 1346 (5th Cir. 1981) (quoting United States v. W.T. Grant, 345 U.S. 629, 633 (1953)). Appellees have failed to meet this burden. They have made no representation to this court that they are dedicated to ensuring equal opportunities and fair accommodation for both their female and male athletes in the long run. They simply state that they have instituted varsity women's fast-pitch softball and soccer and that they have, as required, submitted a Compliance Plan to the district court. Appellees have given no assurance that they will not disband these programs, as they have with varsity fast-pitch softball in the past. In its May 9, 1997, order, the district court, although speaking highly of LSU's turnaround in the area of effective accommodation, nonetheless required periodic reporting for several years. We will not secondguess the district court's reasoned judgment by declaring this issue moot when Appellees have failed to demonstrate that their Title IX effective accommodation violations will not recur.

We do not think, however, that the voluntary cessation exception applies equally to the individual Appellants. Even were LSU to resume its illegal activity, Appellants, because of their graduation, would be unaffected. The question of injunctive relief

29

is therefore, as stated <u>supra</u>, rendered moot as to the named plaintiffs.

## 2. Monetary Relief

Finally, Appellants' damages claim is not moot. The district court held that, with regard to the Pineda Plaintiffs, and we have remanded for a determination whether, with regard to the Pederson Plaintiffs, LSU violated the individual rights of each named plaintiff by failing to accommodate effectively the interests and abilities of female students. Appellees contest the district court's holding. Appellants assert that LSU intentionally discriminated against women. If these questions on appeal are answered in Appellants' favor, then to the extent that LSU's violations caused a named plaintiff's actual damages, that person is entitled to be compensated for those damages. A live controversy, therefore, exists with regard to the damages claim, and the legal questions underlying that claim are not moot. <u>See</u> <u>Henschen</u>, 959 F.2d at 588.

## D. Sovereign Immunity

Appellees contend that the district court lacked subject matter jurisdiction to consider Appellants' claims because Appellees are immune from suit pursuant to the Eleventh Amendment. Appellants, and the United States as Intervenor, counter that the Eleventh Amendment does not bar Appellants' suit because (1) Congress validly abrogated the States' Eleventh Amendment immunity for purposes of Title IX, (2) LSU waived its Eleventh Amendment immunity when it accepted federal funding for its educational

30

institutions, or (3) jurisdiction properly lies under the doctrine of Ex Parte Young.[15]   The district court held that Eleventh Amendment immunity did not deprive the court of subject matter jurisdiction.[16]   See 912 F. Supp. at 901.   The district court's ruling on Appellees' Eleventh Amendment immunity is subject to de novo review.   See Seminole Tribe v. Florida, 11 F.3d 1016, 1021 (11th Cir. 1994), aff'd, 517 U.S. 44 (1996).

In order to abrogate a State's sovereign immunity, Congress must (1) have "unequivocally expresse[d] its intent to abrogate the immunity," and (2) have "acted pursuant to a valid exercise of power."   Seminole Tribe, 517 U.S. at 55 (internal quotations omitted).

There is no dispute that Congress unequivocally has expressed its intent to abrogate the States' sovereign immunity in the context of Title IX.   In response to Atascadero State Hosp. v. Scanlon, 473 U.S. 234 (1985), Congress enacted the Civil Rights Remedies Equalization Act ("CRREA") as part of the Rehabilitation

---

[15] The United States did not join in Appellants' argument that jurisdiction lies under the doctrine of Ex Parte Young. Because we determine that Congress validly abrogated state sovereign immunity in this context, we need not, and will not, address the two alternative arguments.

[16] The district court reasoned that Congress can validly abrogate Eleventh Amendment immunity pursuant to its Article I spending power. See 912 F. Supp. at 901. This reasoning cannot stand in light of Seminole Tribe. Nevertheless, the district court's ultimate conclusion is correct, as we will discuss infra.

Act Amendments of 1986, § 1003, Pub. L. No. 99-506, 100 Stat. 1845 (codified at 42 U.S.C. § 2000d-7).[17]  Section 2000d-7 provides:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, Title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, 42 U.S.C. § 6101 et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d-7(a)(1) (some internal citations omitted).

Thus, the only issue is whether Congress acted pursuant to a valid exercise of power when abrogating the States' immunity.  See Seminole Tribe, 517 U.S. at 59 ("Was the Act in question passed pursuant to a constitutional provision granting Congress the power to abrogate?").  The Fourteenth Amendment is recognized to be such a power.  See id.; Fitzpatrick v. Bitzer, 427 U.S. 445, 452-56 (1976) (finding that, because the Fourteenth Amendment expanded federal power at the expense of state power, the Fourteenth Amendment extended federal power into the province of the Eleventh Amendment and, therefore, § 5 of the Fourteenth Amendment allows Congress to abrogate the immunity of the Eleventh Amendment).  Formerly, the Interstate Commerce Clause, see U.S. CONST. art I, §

---

[17] Atascadero held that § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which prohibits discrimination on the basis of disability by programs receiving federal funds, did not unequivocally demonstrate Congress's intent to abrogate the States' Eleventh Amendment immunity in order to authorize private damage actions against State entities.  See 473 U.S. at 245-46. Section 2000d-7 was a response to this decision; the provision explicitly abrogates the States' Eleventh Amendment immunity in the context of § 504 of the Rehabilitation Act and other similar federal statutes, including Title IX.

8, cl. 3, was also recognized to be such a power. See Pennsylvania v. Union Gas Co., 491 U.S. 1, 19-20 (1989) (plurality opinion) (holding that the power to regulate interstate commerce would be "incomplete without the authority to render States liable in damages"). Seminole Tribe, which involved the Indian Commerce Clause, overruled Union Gas. See Seminole Tribe, 517 U.S. at 63, 72-73 (finding "no principled distinction . . . to be drawn between the Indian Commerce Clause and the Interstate Commerce Clause," and holding that the Eleventh Amendment restricts judicial power under Article III, and Article I powers cannot be used to circumvent constitutional limitations).

After Seminole Tribe, then, legislation passed pursuant to Congress's Article I powers cannot validly abrogate the States' sovereign immunity. Appellees contend that Title IX is Spending Clause legislation, and that therefore Congress does not have the authority after Seminole Tribe to abrogate the States' Eleventh Amendment immunity when acting pursuant to the Spending Clause. Appellants respond that Title IX can also be justified as an exercise of Congress's power pursuant to Section 5 of the Fourteenth Amendment, and that Congress can, after Seminole Tribe, abrogate the States' Eleventh Amendment immunity when acting pursuant to Section 5 of the Fourteenth Amendment.

We must first decide whether Title IX is merely Spending Clause legislation, or whether it can also be supported by Section 5 of the Fourteenth Amendment. This court, in Lesage v. Texas, 158 F.3d 213 (5th Cir. 1998),rev'd on other grounds, 120 S.Ct 467

33

(1999), held that Congress validly abrogated the States' Eleventh Amendment immunity for purposes of Title VI of the Civil Rights Act of 1964 by enacting CRREA, 42 U.S.C. § 2000d-7(a)(1).[18] In response to arguments that Title VI was enacted pursuant to the Spending Clause rather than Section 5 of the Fourteenth Amendment and that Congress therefore could not validly abrogate the States' Eleventh Amendment immunity for purposes of Title VI, we stated that the subjective intent of the legislators in enacting legislation is irrelevant:

> In evaluating the constitutionality of a statute, we simply ask if Congress sufficiently articulated an abrogation of state sovereign immunity and if it had the power to do so . . . . This is an entirely objective inquiry, for "[t]he constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise."

Id. at 217 (quoting EEOC v. Wyoming, 460 U.S. 226, 243 n.18 (1983)) (citations and further internal quotations omitted).

Lesage supports the proposition that, even if Congress stated that it was acting pursuant to the Spending Clause in enacting Title IX,[19] if Congress could have acted pursuant to Section 5 of

_____

[18] Appellants contend that this provision also abrogates the States' Eleventh Amendment immunity for purposes of Title IX.

[19] As Appellees recognize, Congress did not explicitly state upon which provision it relied for authority to pass Title IX. Appellees argue that the statutory framework conclusively demonstrates that Congress was acting pursuant to its Spending Clause power. The Supreme Court has recently agreed. In a series of sexual harassment cases over the last two terms, the Court has made clear its belief that Title IX was enacted pursuant to the Spending Clause. In Davis v. Monroe County Bd. of Ed., 526 U.S. ___, 119 S. Ct. 1661, 1669 (1999), the Court explained that "we have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause." This conclusion follows the Court's reasoning

34

the Fourteenth Amendment, Congress has the authority to abrogate for purposes of Title IX. See id. at 217-18; see also Crawford v. Davis, 109 F.3d 1281, 1283 (8th Cir. 1997) ("The resolution of defendants' contention therefore turns on whether Congress, as an objective matter, could have enacted Title IX pursuant to § 5 of the Fourteenth Amendment."). Moreover, as the Lesage court recognized, "it is the statute abrogating immunity, not the particular substantive provision of the statute, which specifically concerns us." Lesage, 158 F.3d at 218. Because § 2000d-7, the provision which abrogated the States' Eleventh Amendment immunity for purposes of both Title VI and Title IX, was enacted pursuant to Section 5 of the Fourteenth Amendment, the Lesage court found that Congress had validly abrogated the States' Eleventh Amendment immunity. See id. at 218-19.

This reasoning supports the conclusion that Congress had the authority to abrogate the States' Eleventh Amendment immunity for purposes of Title IX—either because Title IX could have been enacted pursuant to Section 5 of the Fourteenth Amendment, see Crawford, 109 F.3d at 1283 ("[W]e are unable to understand how a statute enacted specifically to combat [gender] discrimination could fall outside the authority granted to Congress by § 5."), or because the legislation actually abrogating the States' immunity, § 2000d-7, was enacted pursuant to Section 5, see Lesage, 158 F.3d at 218-19.

---

in Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 287 (1998) and Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 74-75 (1992).

Other circuits have similarly concluded that Congress validly abrogated the States' Eleventh Amendment immunity for purposes of Title IX. In <u>Crawford v. Davis</u>, 109 F.3d 1281 (8th Cir. 1997), the court held that Title IX could be justified by Section 5 of the Fourteenth Amendment, even if Congress did not explicitly state that it was acting pursuant to its Section 5 authority, and therefore Title IX validly abrogated the States' immunity. <u>See</u> <u>id.</u> at 1283. In <u>Doe v. University of Illinois</u>, 138 F.3d 653 (7th Cir. 1998), the court similarly found that Title IX could be justified by Section 5 of the Fourteenth Amendment, and that Congress's abrogation of the States' Eleventh Amendment immunity was therefore valid. <u>See</u> <u>id.</u> at 660; <u>accord</u> <u>Franks v. Kentucky Sch. for the Deaf</u>, 142 F.3d 360, 363 (6th Cir. 1998) (holding that Congress validly abrogated Eleventh Amendment immunity for purposes of Title IX because Congress had authority pursuant to Section 5 of the Fourteenth Amendment to enact Title IX); <u>cf.</u> <u>Timmer v. Michigan Dep't of Commerce</u>, 104 F.3d 833, 838-39 (6th Cir. 1997) (stating that it is not necessary for Congress to say explicitly which constitutional provision it is relying upon, and concluding that the Equal Pay Act was enacted pursuant to Section 5 of the Fourteenth Amendment).

Notwithstanding our conclusion that Title IX validly abrogates the States' sovereign immunity, we pause to address two recent decisions of the Supreme Court, handed down after oral argument in this case, which speak to abrogation issues in the area of Eleventh Amendment sovereign immunity. Appellees have submitted them to us

36

as support for their contention that the instant suit be dismissed under the Eleventh Amendment.  In the first, College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd., 527 U.S. ___, 119 S. Ct. 2219, 1999 WL 412639 (1999), the Court held that legislation under § 5 of the Fourteenth Amendment must be confined to enforcement of the Amendment's other provisions by legislation that remedies or prevents constitutional violations.  In College Savings Bank, Petitioner argued that the Trademark Remedy Clarification Act ("TRCA") was designed to remedy and to prevent state deprivations of two property interests without due process of law, but the Court held that the asserted property interests—the right to be free from a business competitor's false advertising about its own product and the right to be secure in one's business interests—did not qualify as protected property rights.

In Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank, 527 U.S. ___, 119 S. Ct. 2199, 1999 WL 412723 (1999), the Court both reaffirmed its holding in Seminole Tribe that Congress may not rely on Article I powers—here, the Commerce Clause and the Patent Clause—to abrogate sovereign immunity and extended the principle of College Savings Bank to cover actions against states under the Patent and Plant Variety Protection Remedy Clarification Act.  Specifically, the Court in Florida Prepaid held that abrogation under § 5 is invalid where it cannot be sustained as legislation enacted to enforce the guarantees of the Fourteenth Amendment's Due Process Clause.  In order to enact "appropriate" legislation under the remedial power of § 5, see City of Boerne v.

37

*Flores*, 521 U.S. 507, 519 (1997), Congress must identify conduct transgressing the Fourteenth Amendment's substantive provisions and must tailor its legislative scheme to remedy or to prevent such conduct; unremedied patent infringement by the States did not meet the test of <u>City of Boerne</u> and could not, therefore, validly abrogate immunity.

We believe it beyond peradventure that Title IX meets the test first explained in <u>Seminole Tribe</u> and recently clarified by <u>College Savings Bank</u> and <u>Florida Prepaid</u>. Congress expressed a clear intent to abrogate immunity with CRREA, and that Act was appropriately passed under Congress's § 5 power to remedy past discrimination. As such, it was appropriate legislation itself and its goal—protecting the reach of Title IX and other similar statutes—was, by extension, also appropriate.

### III. Title IX

We now turn to the merits of this dispute, and we will address the underlying issues in Parts III and IV of this opinion. In this Part, we affirm the district court's judgment that LSU violated Title IX and reverse the district court's judgment that LSU did not intentionally discriminate against women in the provision of athletics.

### A. Background

Title IX proscribes gender discrimination in education programs or other activities receiving federal financial assistance. <u>See</u> <u>North Haven Bd. of Educ. v. Bell</u>, 456 U.S. 512, 514 (1982). Patterned after Title VI of the Civil Rights Act of

1964, Pub. L. No. 88-352, 78 Stat. 252, 42 U.S.C. § 2000d (1994), Title IX, as amended, contains two core provisions.  The first is a "program-specific" prohibition of gender discrimination:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

§ 901(a), 20 U.S.C. § 1681(a).  The second core provision relates to enforcement.  Section 902 of Title IX authorizes each agency awarding federal financial assistance to any education program to promulgate regulations "ensuring that aid recipients adhere to § 901(a)'s mandate."  North Haven, 456 U.S. at 514.  The "ultimate sanction" for noncompliance is termination of federal funding or the denial of future federal grants to the offending institution. Id.  Like § 901, § 902 is program-specific:

> [S]uch termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding [of noncompliance] has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found . . . .

§ 902, 20 U.S.C. § 1682.

Beginning in the mid-1970's, the Department of Health, Education and Welfare, and its successor, the Department of Education, have relied on their § 902 power to promulgate regulations governing the operation of federally-funded education programs.  These regulations encompass not only athletics policies, but also actions by funding recipients in the areas of, inter alia,

admissions, textbooks, and employment.[20]  See, e.g., 34 C.F.R. §§

106.21  (admissions),  106.42  (textbooks),  106.51  (employment)

(1999).  The regulation most pertinent to the instant controversy

requires that

> No person shall, on the basis of sex, be excluded from
> participation in, be denied the benefits of, be treated
> differently from another person or otherwise be
> discriminated against in any interscholastic,
> intercollegiate, club or intramural athletics offered by
> a recipient, and no recipient shall provide any such
> athletics separately on such basis.

34 C.F.R. § 106.41(a) (1999).  The regulations further provide that

> A recipient which operates or sponsors interscholastic,
> intercollegiate, club or intramural athletics shall
> provide equal athletic opportunity for members of both
> sexes.  In determining whether equal opportunities are
> available the Director will consider, among other
> factors:
>> (1) Whether the selection of sports and levels
>> of competition effectively accommodate the
>> interests and abilities of members of both
>> sexes;
>> (2) The provision of equipment and supplies;

---

[20] The regulations accompanying Title IX define a
"recipient" as

> any State or political subdivision thereof, or any
> instrumentality of a State or political subdivision thereof,
> any public or private agency, institution, or organization,
> or other entity, or any person, to whom Federal financial
> assistance is extended directly or through another recipient
> and which operates an education program or activity which
> receives or benefits from such assistance, including any
> subunit, successor, assignee, or transferee thereof.

34 C.F.R. § 106.2(h) (1999).  The Supreme Court recently
clarified, in holding that the National Collegiate Athletic
Association ("NCCA") is not a Title IX recipient, that
"[e]ntities that receive federal assistance, whether directly or
through an intermediary, are recipients within the meaning of
Title IX; entities that only benefit economically from federal
assistance are not."  National Collegiate Athletic Ass'n v.
Smith, ___ U.S. ___, ___, 119 S. Ct. 924, 929 (1999).

(3) Scheduling of games and practice time;
(4) Travel and per diem allowance;
(5) Opportunity to receive coaching and academic tutoring;
(6) Assignment and compensation of coaches and tutors;
(7) Provision of locker rooms, practice and competitive facilities;
(8) Provision of medical and training facilities and services;
(9) Provision of housing and dining facilities and services;
(10) Publicity.
Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

34 C.F.R. § 106.41(c).

## B.  Title IX Violation

Appellees argue brazenly that the evidence did not demonstrate sufficient interest and ability in fast-pitch softball at LSU and that, therefore, they cannot be liable under Title IX.  The heart of this contention is that an institution with no coach, no facilities, no varsity team, no scholarships, and no recruiting in a given sport must have on campus enough national-caliber athletes to field a competitive varsity team in that sport before a court can find sufficient interest and abilities to exist.  It should go without saying that adopting this criteria would eliminate an effective accommodation claim by any plaintiff, at any time.  In any event, the district court's finding that the requisite level of interest existed is a finding of fact subject to review for clear error.  Having reviewed the record, we determine that the district

41

court did not clearly err because there was ample indication of an interest by women in fast-pitch softball.

Appellees argue that the district court applied the wrong legal framework to assess Appellees' liability by placing the evidentiary burden upon them to explain the reason for their 1983 decision to disband the women's fast-pitch softball team. They argue for de novo review of that decision, but we agree with Appellants and the record supports that the district court considered all the evidence of interest and ability at LSU before concluding that Appellees were in violation of Title IX, not merely the fact that LSU disbanded its team in 1983.

Appellees would have us hold that, although the student population of LSU is 51% male and 49% female, the population participating in athletics is 71% male and 29% female. Given this breakdown, they argue that it is improper to consider proportionality, because to do so would be to impose quotas, and that the evidence shows that female students are less interested in participating in sports than male students. The law suggests otherwise. Title IX provides that the district court may consider disproportionality when finding a Title IX violation:

> This subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in or receipt of the benefits of, any such program or activity by the members of one sex.

20 U.S.C. § 1681(b). LSU's hubris in advancing this argument is remarkable, since of course fewer women participate in sports, given the voluminous evidence that LSU has discriminated against

42

women in refusing to offer them comparable athletic opportunities to those it offers its male students.

Nevertheless, Appellees persist in their argument by suggesting that the district court's reliance on the fact that LSU fields a men's baseball team as evidence of discrimination was improper because there is no requirement that the same sports be offered for both men and women and because LSU offers nine sports for women and only seven for men. We find that it was indeed proper for the district court to consider the fact that LSU fields a men's baseball team while declining to field a comparable team for women despite evidence of interest and ability in fast-pitch softball at LSU.

Appellees finally contest the district court's determination that LSU's decision to add fast-pitch softball and soccer was not for the purpose of encouraging women's athletics. They challenge the district court's finding that LSU did not attempt to determine the interest and ability level of its female student population, contending that there is evidence in the record that shows that LSU does analyze the interest level of its female student athletes. Our review of the record demonstrates no such analysis on the part of LSU. The proper analytical framework for assessing a Title IX claim can be found in the Policy Interpretations to Title IX, which require an analysis of the disproportionality between the university's male and female participation, the university's history of expanding opportunities for women, and whether the university effectively accommodates the interests of its female

43

students.  See Title IX of the Education Amendments of 1972, Policy Interpretation, 44 Fed. Reg. 71,413, 71,414 (1979).  Specifically, the Policy Interpretation explains that Title IX's application to athletic programs covers three general subject areas: scholarships, equivalent treatment, and equal accommodation.  See id. at 71,415, 71, 417.  As a matter of law, a Title IX violation "may be shown by proof of a substantial violation in any one of the three major areas of investigation set out in the Policy Interpretation." Roberts v. Colorado St. Univ., 814 F. Supp. 1507, 1511 (D. Colo.) (emphasis added), aff'd in part & rev'd in part sub nom. Roberts v. Colorado St. Bd. of Agric., 998 F.2d 824 (10th Cir. 1993).  Credible evidence supports the conclusion that LSU failed all three prongs. Nevertheless, addressing merely the accommodation prong, regulations adopted by the Department of Education in 1997 also support the district court's conclusions.  See 34 C.F.R. § 106.37(c)(1) (providing that recipients that award athletic scholarships must do so with a view toward reasonable opportunities for such awards to members of both sexes); id. § 106.41(c)(1) (declaring that "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes"); 45 C.F.R. § 86.41(c)(1) (requiring the consideration of "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes").  Applying this framework, as the Supreme Court has indicated that we should, see Martin v. Occupational Safety &

44

Health Review Comm'n, 449 U.S. 144, 150 (1991), the district court correctly found that LSU did not have a history of expanding women's athletic programs and had not presented credible evidence regarding the interests and abilities of its student body. These findings were not clearly erroneous. See Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985). Regardless, our independent review of the record supports the district court's conclusion that Appellees failed to accommodate effectively its female students. Proper evaluation of the district court's conclusion that Appellees violated Title IX required a careful consideration of the evidence presented at trial. Based on that review, we believe that the district court did not commit clear error in its factual conclusions or legal error in the standards that it applied.

## C. Intentional Discrimination

The district court found that LSU had violated and continued to violate the prescriptions of Title IX. The trial judge further concluded that, notwithstanding this threshold finding, a Title IX claimant must additionally prove intentional discrimination on the part of a recipient before she may recover monetary damages.[21] With respect to the claims at issue in this case, the district court considered the question to be a "very close one" but eventually

---

[21] The district court held that damages could not be recovered under Title IX unless the plaintiff proves that the institution intentionally discriminated. Appellants do not argue on appeal that damages should be available for unintentional discrimination. We, therefore, need not and do not address the accuracy of the district court's holding in this regard.

held that LSU did not intentionally violate Title IX. 912 F. Supp. at 918. Having carefully reviewed the trial record we hold that the district court erred in its legal conclusion. We find that LSU did intentionally violate Title IX, thus we reverse that ruling.

The district court stated that Appellees' actions were not a result of intentional discrimination but rather of "arrogant ignorance, confusion regarding the practical requirements of the law, and a remarkably outdated view of women and athletics which created the byproduct of resistance to change." Id. The district court reasoned, inter alia, that, because Athletic Director Dean testified that he believes that his "women's athletics" program is "wonderful" and because he was ignorant of the program's state of compliance with Title IX, Appellees did not intentionally discriminate against women. See id. at 919.

The district court's decision finding LSU to have unintentionally violated Title IX by not effectively accommodating their female student-athletes simply does not withstand scrutiny. The district court stated that

> Rather than taking notice of the enormous social change which has taken place in the past 25 years, LSU has continued to assume athletics is as it once was, a traditionally male domain, and its women students did not want to participate in athletics in the same manner and to the same extent as its mean, and acted accordingly.

912 F. Supp. at 920 (emphasis added). If an institution makes a decision not to provide equal athletic opportunities for its female students because of paternalism and stereotypical assumptions about their interests and abilities, that institution intended to treat women differently because of their sex. Moreover, Appellees'

46

ignorance about whether they are violating Title IX does not excuse their intentional decision not to accommodate effectively the interests of their female students by not providing sufficient athletic opportunities.

Apparently, Dean "believed his program to be so wonderful that he invited an investigator from the Department of Education's Office of Civil Rights to visit LSU to evaluate the athletics program's compliance with Title IX." Id. That representative's findings confirmed Dean's ignorance of the actual state of compliance with Title IX by his athletic program, see id., but the district court nonetheless reasoned that Dean's testimony was "credible" because "otherwise he would not have invited OCR to LSU to assess the program." Id. This conclusion ignores the fact that, already on notice of potential violations, Dean and others continued to adhere to deprecatory nomenclature when referring to female athletes, refused to authorize additional sports for women, and instead seemed content that the "women's teams fielded [by LSU] during the relevant time frame performed well in competition." Id. This assessment of the athletics program is not merely "arrogance," as the district court concluded, see id.; it belies an intent to treat women differently in violation of the law.

It bears noting that the provisions of Title IX and its attendant regulations are not merely hortatory; they exist, as does any law, to sculpt the relevant playing field. Consequently, Appellees' alleged ignorance of the law does not preclude our finding that LSU acted intentionally. Appellees need not have

47

intended to violate Title IX, but need only have intended to treat women differently.  Cf. Local 189, United Papermakers and Paperworkers v. United States, 416 F.2d 980, 996 (5th Cir. 1969) (holding that "intent" under Title VII requires only that "the defendant meant to do what he did" and did not behave "accident[ally]"); United States v. Koon, 34 F.3d 1416, 1449 (9th Cir. 1994) (applying the same test to constitutional violations), aff'd in part and rev'd in part on other grounds, 518 U.S. 81 (1996); United States v. Balistrieri, 981 F.2d 916, 936 (7th Cir. 1992) (holding that a defendant need not actually know that he is violating the Fair Housing Act in order to be found to have discriminated).  Appellees' outdated attitudes about women amply demonstrate this intention to discriminate, and the district court squarely found that LSU's treatment of women athletes was "remarkably outdated," "archaic," and "outmoded."  912 F. Supp. at 918-20.  Well-established Supreme Court precedent demonstrates that archaic assumptions such as those firmly held by LSU constitute intentional gender discrimination.  See, e.g., United States v. Virginia, 518 U.S. 515, 533 (1996) (holding that an institution's refusal to admit women is intentional gender discrimination in violation of the Equal Protection Clause because, inter alia, of "overbroad generalizations about the different talents, capacities, or preferences of males and females"); Roberts v. United States Jaycees, 468 U.S. 609, 625 (1984) (warning of the dangers posed by gender discrimination based on "archaic and overbroad assumptions").  We conclude that, because classifications based on

48

"archaic" assumptions are facially discriminatory, actions resulting from an application of these attitudes constitutes intentional discrimination.

In addition to the district court's evaluation of LSU's attitudes as "archaic," our independent evaluation of the record and the evidence adduced at trial supports the conclusion that Appellees persisted in a systematic, intentional, differential treatment of women. For instance, in meetings to discuss the possibility of a varsity women's soccer team, Dean referred to Lisa Ollar repeatedly as "honey," "sweetie," and "cutie" and negotiated with her by stating that "I'd love to help a cute little girl like you." Dean also opined that soccer, a "more feminine sport," deserved consideration for varsity status because female soccer players "would look cute running around in their soccer shorts." Dean, charismatically defending LSU's chivalry, later told the coach of the women's club soccer team that he would not voluntarily add more women's sports at LSU but would "if forced to." Among many other examples, Karla Pineda testified that, when she met with representatives of the Sports and Leisure Department to request the implementation of an intramural fast-pitch softball team, she was told that LSU would not sponsor fast-pitch softball because "the women might get hurt."

LSU perpetuated antiquated stereotypes and fashioned a grossly discriminatory athletics system in many other ways. For example, LSU appointed a low-level male athletics department staff member to the position of "Senior Women's Athletic Administrator," which the

NCAA defines as the most senior women in an athletic department. LSU consistently approved larger budgets for travel, personnel, and training facilities for men's teams versus women's teams. The university consistently compensated coaches of women's team's at a rate far below that of its male team coaches.

Appellees have not even attempted to offer a legitimate, nondiscriminatory explanation for this blatantly differential treatment of male and female athletes, and men's and women's athletics in general; they merely urge that "archaic" values do not equate to intentional discrimination. Instead, LSU makes its mantra the contention that it was either ignorant of or confused by Title IX and thus cannot be held intentionally to have discriminated. To support this dubious argument, LSU turns for support to cases that deal with the standard for school liability for sexual harassment under Title IX. A series of cases, crowned by Supreme Court pronouncements in the last two terms, hold that schools sued for harassment under Title IX must have actual knowledge of the harassment and cannot be liable on a theory of strict liability. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, ___, 118 S. Ct. 1989, 1997 (1998); Rosa H. v. San Elizard Indep. Sch. Dist., 106 F.3d 648, 652-53 (5th Cir. 1997); Canutillo Indep. Sch. Dist. v. Leija, 101 F.3d 393, 398-400 (5th Cir. 1997). Where the school has control over the harasser but acts with deliberate indifference to the harassment or otherwise fails to remedy it, liability will lie under Title IX. See Davis v. Monroe County Bd. of Educ., 526 U.S. ___, ___, 119 S. Ct. 1661, 1671

50

(1999).  LSU seeks to apply these holdings to the case at bar, arguing that, before a finding of intentional discrimination is warranted, Appellees must have been aware that they were discriminating on the basis of sex by not effectively accommodating the interests and abilities of its female student-athletes.

We conclude that the Title IX sexual harassment cases discussed above have little relevance in determining whether LSU intentionally discriminated here.  Indeed, the most significant of the sexual harassment holdings actually supports Appellants' argument: LSU arguably acted with deliberate indifference to the condition of its female athletics program.  Cf. Davis, 526 U.S. at ___, 119 S. Ct. at 1671 (holding that deliberate indifference to differential treatment between the genders can itself cause discrimination to occur).  In any event, the requirement in the sexual harassment cases—that the academic institution have actual knowledge of the sexual harassment—is not applicable for purposes of determining whether an academic institution intentionally discriminated on the basis of sex by denying females equal athletic opportunity.  In the sexual harassment cases, the issue was whether the school district should be liable for the discriminatory acts of harassment committed by its employees.  These cases hold that school districts must themselves have actual discriminatory intent before they will be liable for the discriminatory acts of their employees.  In the instant case, it is the institution itself that is discriminating.  The proper test is not whether it knew of or is responsible for the actions of others, but is whether Appellees

51

intended to treat women differently on the basis of their sex by providing them unequal athletic opportunity, and, as we noted above, we are convinced that they did. Our review of the record convinces us that an intent to discriminate, albeit one motivated by chauvinist notions as opposed to one fueled by enmity, drove LSU's decisions regarding athletic opportunities for its female students.

The judgment of the district court is REVERSED and the case REMANDED with instruction to proceed to Stage II.

## IV. Compliance Plan

Appellees challenge the district court's Compliance Plan requirements, as they pertain to soccer. LSU argues that, because the plaintiffs who played soccer lacked eligibility by the time of trial, making their claims moot, the Compliance Plan requirements only should have pertained to fast-pitch softball. Appellees also challenge the requirement that they gauge the athletic interests of incoming students through surveys and like materials.

Appellants argue that the relief granted by the district court was not overbroad because the injury suffered by them was not merely the absence of a women's varsity fast-pitch softball team but Appellees' failure to provide equal athletic opportunity to its female students. They also argue that the requirement that Appellees implement procedures to gauge the interest levels of their students is necessary to promote effective accommodation because, in order effectively to accommodate student interests, the university must know what those interests are. They argue that the

purpose of Title IX is to provide broad-based equality in federally-funded educational programs and not merely to provide relief to individual plaintiffs.

We find this issue nonjusticiable at this time. In Part II.A., we determined that the district court abused its discretion in decertifying the provisionally certified class. We remanded with instructions to consider further final certification of the putative class. In part II.C., we determined that the issue of injunctive relief is moot as to the named plaintiffs. A named plaintiff whose claim has become moot cannot press the merits of an issue on behalf of a class when that class has not properly been certified. See Geraghty, 445 U.S. at 400 n.7, 404.[22]

To maintain the status quo by leaving the district court's injunctive order in place would work an injustice to Appellees, who, through no fault of their own, would be forced to comply with an order the merits of which they are powerless to contest. "A party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment. The same is true when mootness results from unilateral action of the party who prevailed

---

[22] We note that, although we do not reach the merits of the district court's Compliance Plan requirements, we do not, at first blush, find that portion of the Compliance Plan dealing with the evaluation and assessment of student interests and abilities problematic. However, while we have not studied the matter closely, we are unclear how the district court justified granting relief with regard to women's varsity soccer when it determined that no plaintiff had standing to challenge LSU's failure to field such a team. Of course, this concern may disappear after the district court reaches the merits of the Pederson Plaintiffs' issues on remand.

53

below." <u>U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership</u>, 513 U.S. 18, 25 (1994). It cannot reasonably be argued that Appellees brought about mootness in this case by causing Appellants to be graduated. They were, it seems, "frustrated by the vagaries of circumstance." In such instances it is the custom of appellate courts to vacate the lower court's injunctive order, and we follow that custom here. See <u>id.</u> at 22-23, <u>United States v. Munsingwear, Inc.</u>, 340 U.S. 36, 39-40 (1950); <u>Karcher v. May</u>, 484 U.S. 72, 82-83 (1987). On remand, however, should the district court finally certify a class, it is free to reinstate so much of its order and subsequent rulings as is it deems necessary under the then-existing circumstances.

**VI**

The numerous holdings and dispositions included in this opinion warrant iteration:

1) We HOLD that this suit is not barred by the Eleventh Amendment.

2) We HOLD that to establish standing under a Title IX effective accommodation claim of the sort presented here, a party need only demonstrate that she is able and ready to compete for a position on the unfielded team.

3) With regard to Appellants, we REVERSE the district court's ruling that the Pederson Plaintiffs lacked standing to challenge

54

LSU's failure to field a varsity soccer team and REVERSE its subsequent judgment dismissing their claims with prejudice.  We AFFIRM the district court's ruling that Appellants lacked standing to challenge the entire LSU varsity program.  We HOLD that Appellants' damages claims, and the questions of Title IX violation and intentional discrimination underlying them, are not moot as to the named Appellants.  We further HOLD that the issue of injunctive relief is moot as to the named Appellants.  We REMAND to the district court to determine the merits of the Pederson Plaintiffs' claims before proceeding to Stage II of trial, the damages phase.

4) With regard to the putative class, we HOLD that the numerosity prong of Rule 23(a) was satisfied and a class was necessary, if any such requirement exists.  Accordingly, we VACATE the district court's decertification order, REVERSE the district court's judgment dismissing the claims for class relief, and REMAND with instructions to consider further the certification of the putative class in light of this opinion.  We HOLD that the issue of injunctive relief is not moot as to the putative class.

5) With regard to the merit issues, we AFFIRM the district court's judgment that Appellees violated Title IX.  We REVERSE the district court's finding that Appellees did not intentionally discriminate, VACATE its subsequent judgment denying the Pineda Plaintiffs' damages claims, and REMAND to the district court with instructions to proceed to Stage II of trial.  We HOLD that we lack

55

jurisdiction to address the district court's injunctive relief order and VACATE that order, leaving the district court free to reinstate so much of the order and subsequent rulings as it deems necessary, if and when a class is finally certified.

Appellants do not argue any points of error regarding the orders appealed from in Nos. 94-30680 and 95-30777; therefore, Nos. 94-30680 and 95-30777 are DISMISSED. We AFFIRM the order appealed from in No. 97-30427. With regard to Nos. 97-30719 and 97-30722, we VACATE the order approving LSU's Compliance Plan with instructions. With regard to the final judgment appealed from in 97-30744 and 97-30781, and the opinion appealed from in 96-30310, we AFFIRM in part, REVERSE in part, VACATE in part, and REMAND in part with instructions. All motions carried with the case are DENIED. Each party shall bear its own costs.