SUHRHEINRICH, J., delivered the opinion of the court, in which ALAN E. NORRIS, J., joined. NATHANIEL R. JONES, J. (pp. 698-706), delivered a separate dissenting opinion.
OPINION
SUHRHEINRICH, Circuit Judge.
Plaintiffs, a group of female student athletes attending Kentucky high schools, appeal following remand from the district court’s order granting summary judgment to Defendant state school board and school athletic association on Plaintiffs’ claim of sexual discrimination under Title IX of the Education Amendments of 1972, as amended by the Civil Rights Restoration Act of 1987 (20 U.S.C. § 1681) (“Title IX”). Plaintiffs also appeal the denial of their post-judgment motion for attorneys’ fees. We AFFIRM.
I. BACKGROUND
In 1992, Plaintiffs sued Defendants Kentucky High School Athletic Association (“Association”) and the Kentucky State Board for Elementary and Secondary Education (“Board”), claiming that the Association’s failure to sanction fast-pitch softball violated the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1983, Title IX, Section 3 of the Constitution of the Commonwealth of Kentucky, and Title XXVII, Labor and Human Rights, Chapter 344, Civil Rights (Ky.Rev. Stat.Ann. § 344.020(l)(b) (Banks-Baldwin *688 1997)). Specifically, Plaintiffs alleged that Defendants’ failure to sponsor fast-pitch softball for female students diminished the ability of female student athletes to compete for college fast-pitch softball athletic scholarships when compared with male student athletes who played high school baseball and then competed for college baseball athletic scholarships. Plaintiffs requested declaratory and injunctive relief sanctioning fast-pitch softball for girls, compensatory damages, certification as a class, attorneys’ fees, and costs.
The Board and Association defended on the basis of its “25 percent” rule, whereby a new sport would not be sanctioned unless at least 25 percent of the member schools indicated a willingness to participate. At the time the lawsuit was filed, two surveys, in 1988 and 1992 respectively, revealed that the member schools indicated only a 9 percent (1988) and a 17 percent (1992) interest in fast-pitch softball for girls.
The district court granted Defendants’ motions for summary judgment, holding that: (1) Defendants had complied with Title IX because they had offered equal opportunities in accordance with the interests and abilities of students; and (2) Defendants had complied with the Equal Protection Clause because they permitted students to participate in sanctioned sports without gender restriction. Plaintiffs appealed, and this Court affirmed in part and reversed in part. See Horner v. Kentucky High School Athletic Ass’n, 43 F.3d 265 (6th Cir.1994) (Horner I).
Homer I affirmed the judgment for Defendants on Plaintiffs’ equal protection claim because Plaintiffs failed to prove that Defendants intentionally discriminated against them, as required by the Equal Protection Clause. See id. at 276. The court held that Plaintiffs had not alleged that Defendants adopted or adhered to the 25 percent rule because of rather than in spite of its disparate impact on females and that sheer disparate impact is insufficient to demonstrate an equal protection violation. The Homer I panel reversed the judgment for Defendants on Plaintiffs’ Title IX claim, however, finding that issues of fact “abound[edj.” See id. at 275.
While Plaintiffs’ first appeal was pending in this Court, the Kentucky General Assembly amended the statute regulating high school sports. See Ky.Rev.Stat. § 156.070(2) (Banks-Baldwin 1995) (effective July 15, 1994). Where a school offered one of two similar sports,- the amended statute directed the Board and the Association to promulgate regulations to offer the sport for which the National Collegiate Athletic Association (“NCAA”) offers athletic scholarships. In response to the passage of § 156.070(2), the Association amended its Bylaw 40, to state:
If a member school sponsors or intends to sponsor an athletic activity that is similar to a sport for which NCAA members offer an athletic scholarship, the school shall sponsor the athletic activity or sport for which the scholarships are offered. The athletic activities which are similar to sports for which NCAA members offer scholarships are: Girls’ fast pitch softball as compared to slow pitch.
KHSAA Bylaws, Div. IV, Bylaw 40.[1]
On remand, the district court again granted summary judgment for Defen *689 dants. The district court held that: (1) Plaintiffs’ claims for class certification, in-junctive relief, and declaratory relief under Title IX were moot because of the amendment to Ky.Rev.Stat. Ann. § 156.070; (2) the Title IX claims of Plaintiffs who had graduated were also moot; and (3) Plaintiffs’ claims for monetary damages under Title IX failed because Plaintiffs had presented no evidence of intentional discrimination.
Plaintiffs moved to alter judgment and also moved for attorneys’ fees. The district court denied both motions. Regarding attorneys’ fees, the district court found that Plaintiffs had received no relief on the merits of their claim, and that there was no proof that Plaintiffs had been the catalyst for Defendants’ policy change. Plaintiffs appeal.
II. DISCUSSION
On appeal, Plaintiffs challenge the district court’s refusal to grant money damages under Title IX and its denial of then-request for attorneys’ fees.
A. Compensatory Damages
Plaintiffs argue that the district court erred in granting summary judgment because the Homer I panel did not hold that there was no evidence of intentional discrimination by Defendants regarding Title IX. Plaintiffs further contend that Title IX does not require intentional discrimination to recover damages. Finally, Plaintiffs argue that if monetary damages are premised upon a finding of intentional discrimination, Defendants’ gender-based classification meets that standard. We address Plaintiffs’ second argument first.
1. Intent Requirement
Plaintiffs contend that a lack of intentional discrimination does not always preclude a plaintiff from recovering money damages under Title IX. Plaintiffs’ claim notwithstanding, proof of intent, however defined, is the sine qua non to compensatory relief for any type of Title IX violation. A brief history of the key Title IX cases makes that clear. In all of the relevant cases, the Supreme Court has consistently invoked a “contract” rationale: that under Spending Clause legislation, the relationship between the government and the federal funding recipient is consensual. A recipient should therefore not be subject to money damages unless it has notice that it will be liable for the conduct at issue.
In 1979, the Supreme Court first construed an implied private right of action under Title IX. See Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). The Court reasoned that because Title IX was patterned after Title VI of the Civil Rights Act of 1964, which has been construed as containing an implied* private right of action, “[t]he draft.ers of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been [interpreted and applied].” Id. at 696, 99 S.Ct. 1946. See also Guardians Ass’n v. Civil Serv. Comm’n of New York City, 463 U.S. 582, 594, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (plurality) (noting that a major part of the analysis in Cannon was “that Title IX had been derived from Title VI, that Congress understood that private remedies were available under Title VI, and that Congress intended similar remedies to be available under Title IX”).
The relationship between monetary damages and proof of intent emerged in Guardians, a Title VI case. Thére, Black and Hispanic police officers sued for damages under Title VI, alleging that then-layoffs under the police department’s last-hired, first-fired policy were discriminatory. The plaintiff officers claimed that the policy disproportionately affected them because they had lower scores on qualifying examinations than White applicants and accordingly were hired later than higher scoring White applicants. Thus, when it *690 came layoffs, Black officers were laid-off before White officers who had been hired before plaintiffs because of their higher qualifying examinations. The district court acknowledged the discriminatory impact of the policy but, nevertheless, found that the plaintiffs failed to prove that the defendant had acted with discriminatory intent.
The plaintiffs appealed the issue of whether Title VI requires proof of discriminatory intent. See id. at 584, 103 S.Ct. 3221. Although a fractured ruling, a majority of the Court held that Title VI supports a private right of action providing limited declarative and injunctive relief for unintentional violations. See id. at 602, 103 S.Ct. 3221. A different majority of the Court rejected the plaintiffs’ argument that monetary damages were available for unintentional discrimination.[2] Although his rationale for this ruling did not gain a majority, Justice White explained that:
We have also indicated that “make whole” remedies are not ordinarily appropriate in private actions seeking relief for violations of statutes passed by Congress pursuant to its “power under the Spending Clause to place conditions on the grant of federal funds.” Pennhurst State School v. Halderman, 451 U.S. 1, 15, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981). This is because the receipt of federal funds under typical Spending Clause legislation is a consensual matter: the State or other grantee weighs the benefits and burdens before accepting the funds and agreeing to comply with the conditions attached to their receipt....
Id. at 596, 103 S.Ct. 3221 (White, J.).
In Franklin v. Gwinnett County Public Schools., 503 U.S. 60, 74, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Supreme Court explicitly established that the implied right of action under Title IX in Cannon provides a damages remedy. In Franklin, a student sued a school district under Title IX, alleging that the school district knew that she had been sexually harassed by a teacher, but did nothing. The Court held that damages were not available for Title IX violations from the school district unless the discrimination was intentional. Significantly, Franklin characterized the holding of Guardians the following way:
Though the multiple opinions in Guardians suggest that the difficulty of inferring the common ground among the Justices in that case, a clear majority expressed the view that damages were available under Title VI in an action seeking remedies for an intentional violation, and no Justice challenged the traditional presumption in favor of a federal court’s power to award appropriate relief in a cognizable cause of action.
Id. at 70, 112 S.Ct. 1028.
Justice White, this time writing for the majority, applied the same Spending Clause analysis to Title IX that he used in Guardians under Title VI:
In Pennhurst State School and Hospital v. Halderman, ... the Court observed that remedies were limited un *691 der such Spending Clause statutes when the alleged violation was unintentional. Respondents and the United States maintain that this presumption should equally apply to intentional violations. We disagree. The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award.... This notice problem does not arise in a case such as this, in which intentional discrimination is alleged.
Franklin, 503 U.S. at 74-75, 112 S.Ct. 1028 (citation omitted) (emphasis added). Franklin did not, however, define the contours of the school district’s liability in such a situation.
Gebser v. Lago Vista Independent School District, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) took up that task. See id. 118 S.Ct. at 1995. There the Court held that a school district may be held liable for damages under Title IX, but only if the district had “actual notice” and was “deliberately indifferent” to the underlying violation. See id. at 1999. In Geb-ser, a high school student and her parents sued a school district for damages under Title IX, alleging that a teacher sexually harassed her. The Supreme Court rejected the use of agency or negligence principles to render the school district liable for monetary damages under Title IX. See id. at 1997 (“we conclude that it would ‘frustrate the purposes’ of Title IX to permit a damages recovery against a school district for a teacher’s sexual harassment based on principles of respondeat superior or constructive notice, i.e., without actual notice to a school district official”). Observing once again that Title IX was modeled after Title VI, Justice O’ Connor, writing for the majority, invoked the “contract” rationale of Guardians:
Title IX’s contractual nature has implications for our construction of the scope of available remedies. When Congress attaches conditions to the award of federal funds under its spending power, as it has in Title IX and Title VI, we examine closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with the condition. Our central concern in that regard is with ensuring “that the receiving entity of federal funds [has] notice that it will be liable for a monetary award.” Justice White’s opinion announcing the Court’s judgment in Guardians Assn. v Civil Serv. Comm’n of New York City, for instance, concluded that the relief in an action under Title VI alleging unintentional discrimination should be prospective only, because where discrimination is unintentional, “it is surely not obvious that the grantee was aware that it was administering the program in violation of the [condition].” We confront similar concerns here. If a school district’s liability for a teacher’s sexual harassment rests on principles of constructive notice or respondeat superior, it will likewise be the case that the recipient of funds was unaware of the discrimination. It is sensible to assume that Congress did not envision a recipient’s liability in damages in that situation.
Gebser, 118 S.Ct. at 1998 (citations omitted).[3]
*692 Most recently, in Davis v. Monroe County Board of Education, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), the Supreme Court considered whether a damages action under Title IX will lie against a school board for student-on-student harassment. Consistent with its earlier cases, the Davis Court held that private damages actions are available only where federal funding recipients act with “deliberate indifference” to “known” acts of harassment. Again, the Court reasoned:
This Court has indeed recognized an implied private right of action under Title IX, see Cannon v. University of Chicago, supra, and we have held that money damages are available in such suits, Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). Because we have repeatedly treated Title IX as legislation enacted pursuant to Congress’ authority under the Spending Clause, however, see, e.g., Gebser v. Lago Vista Independent School, supra, at 287, 118 S.Ct. 1989 (Title IX); Franklin v. Gwinnett Public County Schools, supra, at 74-75, and n. 8, 112 S.Ct. 1028 (Title IX), see also Guardians Assn. v. Civil Serv. Comm’n of New York City, 463 U.S. 582, 598-99, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (opinion of White, J.) (Title VI), private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue. When Congress acts pursuant to its spending power, it generates legislation “much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.” Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). In interpreting language in spending legislation, we thus “insistt] that Congress speak with a clear voice, ‘recognizing that “[t]here can, of course, be no knowing acceptance [of the terms of the putative contract] if a State is unaware of the conditions [imposed by the legislation] or is unable to ascertain what is expected of it.” ’ ” Ibid; see also id., at 24-25, 101 S.Ct. 1531.
Id. at 639-40, 119 S.Ct. at 1669-70. Davis thus extended the rule of Gebser to student-on-student sexual harassment when the school officials are aware of the misconduct but do nothing to stop it, despite its ability to exercise control over the situation.
In sum, although the Supreme Court has not yet expressly ruled on the point, we think that it would likely hold that proof of intentional discrimination is a prerequisite for money damages under Title IX when a facially neutral policy is challenged under a disparate impact theory. As the preceding discussion illustrates, the Supreme Court has consistently applied Justice White’s Spending Clause analysis as first articulated in Guardians in its Title IX decisions. Given the consensual relationship between federal agency and recipient, the recipient must be aware of the conditions attached to the receipt of those funds. As Justice White remarked in Franklin, “The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award.” Franklin, 503 U.S. at 74, 112 S.Ct. 1028. The dissent, in suggesting that we are ignoring Title IX’s remedial purposes, completely ignores this countervailing interest, which the intent requirement seeks to accommodate. Thus, we conclude that compensatory damages under Title IX are available when a facially neutral policy is challenged only if an intentional violation is shown.
This leaves the question of what standard to apply to determine intent when a *693 facially neutral policy is challenged. Currently, the only clear test in the Supreme Court is that of “deliberate indifference.” However, the cases from which that test arose, Franklin, Gebser, and Davis, all address deliberate indifference to sexual harassment, and are not readily analogous to the present situation. See Pederson v. Louisiana State Univ., 201 F.3d 388, 412-13 (5th Cir.2000). In those cases the school district was sued for its failure to prevent its agents from sexually harassing a student (or engaging in some other form of misconduct). Thus, “intent” in that context means “actual notice” of the abuse by a third party and a failure to stop it.
This ease is the Title IX equivalent of Guardians. In Guardians, the district court acknowledged the disparate impact of the defendant police department’s employment policies but did not impose liability for damages because the policies were not intentionally discriminatory. However, as the dissent notes, only Justice White advocated a standard for intentional discrimination when a facially neutral policy is challenged, that of “discriminatory animus.” See Guardians, 463 U.S. at 584, 103 S.Ct. 3221 (White, J.) (“I conclude that ... in the absence of proof of discriminatory animus, compensatory relief should not be awarded to private Title VI plaintiffs”); id. at 607 n. 27, 103 S.Ct. 3221 (same). The dissent nonetheless advocates the “deliberate indifference” of Franklin, Gebser, and Davis; and criticizes the discriminatory animus standard as “overdemanding,” “near[ly] insurmountable,” and “antithetical to the remedial purposes of Title IX.”
We can envision various scenarios in which the discriminatory animus and deliberate indifference tests might help establish “intent” under Title IX when a facially neutral policy is challenged.[4] However, because of Plaintiffs’ fundamental failure to establish a violation of Title IX, let alone an intentional violation,[5] we need not adopt any test at this time. This brings us to Plaintiffs’ second contention.
2. Plaintiffs’ Proofs
In holding that Plaintiffs’s Title IX claim for compensatory damages failed for lack of proof of intentional discrimination, the district court held that:
It is clear, as a matter of the law of the case; that there was no intentional discrimination by defendants in this case. Horner v. Kentucky High School Ass’n., 43 F.3d 265, 276 (6th Cir.1994).3
*694 [FN]3 The Sixth Circuit determined that plaintiffs failed to offer sufficient evidence on the issue of intentional discrimination to defeat defendants’ motion for summary judgment on the Equal Protection Claim. Plaintiffs have not offered any additional evidence regarding intentional discrimination since the case was remanded from the Sixth Circuit.
(J.A. 340.)[6] Plaintiffs contend that this ruling is wrong because the Homer I panel’s ruling pertained only to their Equal Protection Claim; and furthermore, that the Sixth Circuit explicitly held that Plaintiffs had made their prima facie case under Title IX.
Plaintiffs are correct that the ruling in Homer I regarding intentional discrimination pertained only to their equal protection claim. Thus, the district court was technically incorrect in holding that the original panel’s decision was “law of the case” as to Plaintiffs’ Title IX claim. Given the Homer I panel’s holding that there were genuine issues of fact regarding a Title IX violation in the first place, a ruling that there was no evidence of intentional discrimination under Title IX would have been premature. This, however, brings us to Plaintiffs’ contention that our previous decision found that they had stated a prima facie case under Title IX. That is not correct, as an examination of our original decision reveals.
Initially, Homer I discussed the analysis to be used in determining whether Defendants had complied with Title IX’s equal opportunity mandate.[7] The Homer I panel noted that the regulations implementing the statute’s nondiscriminatory requirements “do not impose an independent requirement that an institution always sponsor separate teams for each sport it sanctions.” Id. at 273 (citing 34 C.F.R. § 106.41(b)). The panel also noted that “the regulations do require that institutions provide gender-blind equality of athletic opportunity to its students.” Id. (citing 34 C.F.R. § 106.41(c)). This requires an evaluation of several factors, including “ ‘[wjhether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes[.]’ ” Id. (quoting 34 C.F.R. § 106.41(c)(1)).
In making this assessment, the Homer I panel deferred to the Department of Health, Education, and Welfare’s Policy Interpretation of 1979. See id. To satisfy the effective accommodation requirement of 34 C.F.R. § 106.41(c)(1), “an institution must effectively accommodate the interests of both sexes in both the selection of the sports and the levels of competition, to the extent necessary to provide equal athletic opportunity.” Id. (citing Policy Interpretation, Section VII.C.l., 44 Fed.Reg. at 71,417) (emphasis added).
*695 Regarding the interests of the students, Homer I noted that “the Policy Interpretation instructs that the methods chosen by the institution must be nondiscriminatory and must not disadvantage members of an underrepresented sex.” Id. (citing Policy Interpretation, Section VII.C.3., 44 Fed.Reg. at 71,417). The court held:
The district court found that plaintiffs have an unrestricted opportunity to compete based upon the interests of the member schools. ■ However, the interests of the member schools is not necessarily identical with that of the students, a question on which the record is completely silent. At best, the record reflects that 17 percent of the member schools were interested in having fast-pitch softball sanctioned. The interest of female students at other schools is unknown, because there is no information regarding whether the member schools polled their students before responding, or failing to respond, to the KHSAA’s survey.
Id. (emphasis added).
Regarding the selection of sports, the Homer I panel noted that Title IX Plaintiffs must establish that:
(1) The opportunities for members of the excluded sex have historically been limited;
(2) There is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team; and
(3) Members of the excluded sex do not possess sufficient skill to be selected for a single integrated team, or to compete actively on such team if selected.
Id. at 274 (quoting Policy Interpretation, Section VII.C.4.b., 44 Fed.Reg. at 71,418).
Regarding these factors, the Homer I panel held that there was record evidence to support the first requirement, but not the second or third:
With respect to subsection (1), there is evidence in the record that the opportunities for girls were, and are, more limited than those for boys. With respect to subsection (2), the level of interest of all high school girls in fast-pitch softball is unknown. With respect to subsection (3), the record reflects only that girls are not prohibited from playing on the boys’ baseball teams. The record does not disclose whether and to what extent girls actually play.
Id. at 274 (emphasis added). Thus, contrary to Plaintiffs’ assertions on appeal, this court did not hold in Homer I that Plaintiffs had met their initial burden.
The panel also set forth the factors in the Policy Interpretation to assess an institution’s effective accommodation of the students’ interest in the selection of the levels of competition:
(1) Whether the intercollegiate level participation opportunities for males and female students are provided in numbers substantially proportionate to their respective enrollments; or
(2) Where the numbers of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex;
(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.
Id. (quoting Policy Interpretation, Section VII.C.5.a, 44 Fed.Reg. at 71,418).
Regarding these factors, the original panel noted that:
The plaintiffs bear the burden of proof on subsection (1), that of showing statistical disparity.[FN8] Roberts, 998 F.2d at 828; Cohen, 991 F.2d at 901. Sub *696 stantial proportionality provides a safe harbor for recipients of federal funds.... If the plaintiffs prove disparity, then the institution must show that it satisfies subsection (2). If it fails here, the plaintiffs may prevail by sustaining their burden of proof under subsection (3) and demonstrating an unmet interest on the part of the underrepresented sex. Roberts, 998 F.2d at 830-31; Cohen, 991 F.2d at 901. Subsection (3) “ ‘sets a high standard: it demands not merely some accommodation, but full and effective accommodation. If there is sufficient interest and ability among members of the statistically underrepresented gender, not slaked by existing programs, an institution necessarily fails this prong of the test.’ ” Roberts, 998 F.2d at 831-32 (quoting Cohen, 991 F.2d at 898).
FN8. Although the record is silent on this point, the court was informed at oral argument that 33,891 boys (65 percent) participate in sanctioned sports in Kentucky, while only 18,860 girls (34.8) percent participate.
Id. at 275 (emphasis added). We therefore concluded that:
It is evident that genuine issues of material fact abound in this case, and preclude any determination that defendants have complied with Title IX’s equal opportunity mandate. We therefore reverse the district court’s entry of summary judgment on plaintiffs’ Title IX claims.
Id. Again, the Homer I panel did not hold that Plaintiffs had met their burden under Rule 56 of the Federal Rules of Civil Procedure. In fact, we specifically noted that the record was silent on statistical disparity. The only proof Plaintiffs offered on remand was that of statistical disparity, in support of their statements at oral argument. Plaintiffs offered no proof on remand that their interests were not being met, despite the policy allowing them to play on boys’ fast-pitch softball teams. As the dissent in Homer I observed: “Title IX, when read with the implementing regulation and the policy interpretation, places the burden of proving statistical disparity and unmet interest squarely on the shoulders of the plaintiffs.” Id. at 277 (Batchelder, .J., dissenting) (citing Roberts v. Colorado State Bd. of Agric., 998 F.2d 824, 829 n. 5 (10th Cir.1993); Cohen v. Brown Univ., 991 F.2d 888, 901-01 (1st Cir.1993)).
In sum, the Homer I panel did not hold that Plaintiffs made out a prima facie case of a Title IX violation, but merely held that Plaintiffs had established the first requirement of their prima facie case. Notably, the Homer I panel specifically advised Plaintiffs of the proof necessary to prevail on their Title IX claim, and granted a remand for further development of the record. Notwithstanding, upon renewed motions for summary judgment by Defendants, other than proof of statistical disparity, Plaintiffs still failed to offer any additional evidence that Title IX’s equal opportunity mandate had been violated, let alone intentionally violated. Absent a predicate violation, it is axiomatic that there can be no intentional violation of Title IX. Thus, in the language of the dissent, there can be no “actual notice” and “deliberate indifference” to Plaintiffs’ unmet interest. We therefore affirm the district court’s grant of summary judgment, although on slightly different grounds.
Nevertheless, even if we assumed that Plaintiffs had established their prima facie case, we would still hold that they failed to establish an intentional violation. Certainly, on this record, there is no evidence of discriminatory animus. See Bray v. Alexandria Women’s Health Clinic, 506 U.S. 263, 269-70, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (defining discriminatory animus towards women in an action under 42 U.S.C. § 1885(3) as having “a purpose that focuses upon women by reason of their sex ... directed specifically at a women as a class”); Feeney, 442 U.S. at 279, 99 S.Ct. 2282 (stating in the equal *697 protection context that “ ‘discriminatory purpose’ ... implies more than intent as volition or intent as awareness of consequences”). Plaintiffs offered no evidence of discriminatory intent.[8] Nor is there any proof under the dissent’s proposed standard. Plaintiffs have simply not established that Defendants had actual knowledge of the discriminatory effect of their facially neutral rule, yet failed to remedy the violation. In any event, Plaintiffs’ and the dissent’s position is really a “constructive” notice argument under the guise of the deliberate indifference test: Because there was a boys’ fast-pitch softball team and not a girls’ fast-pitch softball team, Defendants must have known that they were treating girls differently than boys; Defendants, as federal funding recipients, are charged with notice of the Title IX law, which prohibits gender discrimination; Defendants were therefore in knowing violation of Title IX.
This reasoning is flawed because it reads Title IX as requiring perfect parity. However, as just discussed, all the statute and implementing regulations require is equality of athletic opportunity. The statute itself does not require gender balance. See 20 U.S.C.A. § 1681(b)(West 1990) (providing that “[njothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area”); Roberts, 998 F.2d at 829 n. 5. Further, in certain instances, separate teams for males and females are allowed. See 34 C.F.R. § 106.41(b) (1998) (permitting separate sports teams for males and females where selection for the team is based on competitive skill or is a contact sport). As we pointed out in Hor-ner I, the regulations themselves do not impose an independent requirement that an institution always sponsor separate teams for all sanctioned sports. See Horner I, 43 F.3d at 273 (citing 34 C.F.R. § 106.41(b)). Thus, it would be impossible for Defendants to be on notice that they were in violation of Title IX simply because they sponsored only boys’ fast-pitch softball. Finally, it is undisputed that Defendants permit female athletes to try out for traditional male sports, including contact sports. Absent any evidence that this opportunity did not adequately meet girls’ needs and abilities, there can be no finding that Defendants knowingly violated Plaintiffs’ Title IX rights.
3. Gender Classification
For the first time on appeal, Plaintiffs argue that Defendants violated Title IX because the KHSAA classifies its sports by gender. For the reasons stated, classification by gender is not a per se violation of Title IX. In any event, the claim is forfeited.
B. Attorneys’ Fees
Plaintiffs also claim that they are prevailing parties for purposes of awarding attorneys’ fees. This Court reviews the factual determination that a party is a prevailing party for clear error. See *698 Payne v. Board of Educ., Cleveland City Schools, 88 F.3d 392, 397 (6th Cir.1996). This Court reviews the denial of a motion for attorneys’ fees for an abuse of discretion. See Jones v. Continental Corp., 789 F.2d 1225, 1229 (6th Cir.1986).
To recover attorneys’ fees under 42 U.S.C. § 1988, a party must be a prevailing party. To be a prevailing party, a party must receive at least some relief on the merits of his claim such as a judgment, an injunction, or a consent decree. See Hewitt v. Helms, 482 U.S. 755, 760-61, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987).
Plaintiffs claim that Defendants changed their policies and practices because of their lawsuit. The District Court, however, found no evidence for this claim. The record reflects that Defendants changed their policies only after the Kentucky General Assembly amended Ky.Rev. Stat. § 156.070, directing Defendants to promulgate regulations to provide fast-pitch softball. Plaintiffs offered no record evidence that their lawsuit caused the Kentucky General Assembly to amend Ky. Rev.Stat. § 156.070. The district court’s finding that Plaintiffs were not prevailing parties is, therefore, not clearly erroneous.
Nevertheless, a plaintiff who is not a prevailing party under § 1988, may also recover attorneys’ fees if the lawsuit was the primary “catalyst” for causing a defendant to change its conduct favorably toward the plaintiff. See Payne, 88 F.3d at 397. The catalyst theory applies a two-part test. First, the plaintiffs lawsuit must be a necessary and important factor in achieving the relief sought. Second, the plaintiff must prove that the changed conduct was required because of a violation of the law. See id: at 397-98.
Plaintiffs have not demonstrated that their lawsuit was a necessary and important factor in changing the twenty-five percent rule. Plaintiffs offer an affidavit from a member of the Kentucky General Assembly stating that Plaintiffs’ counsel advised her on amending Ky.Rev. Stat. § 156,070. However, Plaintiffs did not enter this affidavit into the record and it is not properly before this Court. See USA Petroleum Co. v. Atlantic Richfield, 13 F.3d 1276, 1284 (9th Cir.1994).
In short, Plaintiffs have not shown that they are prevailing parties because .they did not obtain an enforceable judgment,.an injunction, a declaratory judgment, or a consent decree altering the legal relationship between them and Defendants. Further, based on the record, Plaintiffs have not demonstrated that their lawsuit was an important and necessary factor in changing the law.
III. CONCLUSION
Accordingly, the judgment of the district court is AFFIRMED.

. The following language was added to this bylaw, effective for the 1995-96 school year:
To qualify as having "sponsored” a sport, a school must be able to demonstrate the following:
(1) If similar versions of a particular sport exist and there are differences in the scholarship opportunities at the NCAA level in that sport, a survey must be taken of the student population at reasonable times and places to determine the level of interest in the sport(s).
(2) If said survey reveals sufficient interest to field the normal squad required for play in the particular sport and if any version of the sport is to be played, the school shall make facilities, staff, and other allowances to properly field a team in the version of the sport for which the NCAA members offer scholarships.
*689 KHSAA Bylaw 40 § 2(1), (2).

. Justice White explained the fractured votes as follows: •
Despite the numerous opinions, the views of at least five Justices on two issues are identifiable. The dissenters, Justices BRENNAN, MARSHALL, BLACKMUN, AND STEVENS, join with me to form a majority for upholding the validity of the regulations incorporating a disparate-impact standard. See n.2, supra. A different majority, however, would not allow compensatory relief in the absence of proof of discriminatory intent. Justice REHNQUIST and I reach this conclusion directly. See Parts II and IV, supra; post, 103 S.Ct. at 3237 (REHNQUIST, J., concurring in the judgment). Justice POWELL, joined by THE CHIEF JUSTICE, post 103 S.Ct. at 3235, believe that no private relief should ever be granted under Title VI under any circumstances. Justice O’CONNOR, post, 103 S.Ct. at 3237, would hold that all relief should be denied unless discriminatory intent is proven. It follows from the views of these latter three Justices that no compensatory relief should be awarded if discriminatory animus is not shown.
Id. at 607 n. 27, 103 S.Ct. 3221 (White, J.).

. The Gebser court also explained the distinction between Title IX and VII:
That contractual framework distinguishes Title IX from Title VII, which is framed in terms not of a condition but of an outright prohibition. Title VII applies to all employers without regard to federal funding and aims broadly to "eradicat[e] discrimination throughout the economy.” Landgraf v. USI Film Products, 511 U.S. 244, 254, 114 S.Ct. 1483, 1491, 128 L.Ed.2d 229 (1994) (internal quotation marks omitted). Title VII, moreover, seeks to "make persons whole for injuries suffered through past discrimination.” Ibid, (internal quotation marks omitted). Thus, whereas Title VII aims centrally to compensate victims of discrimination, Title IX focuses more on "protecting” individuals from discriminatory practices carried out by recipients of federal funds. Cannon, supra, at 704, 99 S.Ct., at 1961-62. That might explain why, when *692 the Court first recognized the implied right under Title IX in Cannon, the opinion referred to injunctive or equitable relief in a private action, see 441 U.S., at 705, and n. 38, 710, n. 44, 711, 99 S.Ct., at 1962, and n. 38, 1964, n. 44, 1965, but not to a damages remedy.
Gebser, 118 S.Ct. at 1997-98.

. For example, a deliberate indifference test might be appropriate when Plaintiffs claim that defendant school officials had actual knowledge of the disparate impact of their policies, either at the time of enactment or when subsequently brought to their attention post-enactment, and turn a blind eye. We can also perceive school officials adopting a policy simply because of gender bias, without empirical evidence of disparate effect. In this situation, we do not think that the deliberate indifference test works, because it would be difficult for Plaintiffs to prove actual knowledge of disparate impact. The discriminatory animus test, albeit a stricter standard, might help Plaintiffs establish the requisite intent.
Recently, the Fifth Circuit held that the deliberate indifference test applied in Title IX sexual harassment cases “ha[s] little relevance” in determining whether an academic institution intentionally discriminated on the basis of sex by failing to accommodate female athletes. See Pederson v. Louisiana State Univ., 201 F.3d 388, 412-13 (5th Cir.2000). According to Pederson, “[t]he proper test is not whether [the school district] knew of or is responsible for the actions of others, but whether [the school district] intended to treat women differently on the basis of their sex by providing them unequal athletic opportunity.” Id. As the Pederson court observed, classifications based on "archaic” assumptions are facially discriminating, and "actions resulting from an application of these attitudes constitutes intentional discrimination.” Id. at 411-12. However, as discussed, this case offers no proof of intentional discrimination.

. For this reason, we disagree with the dissent’s contention that "[a]n answer to [the] question [of whether the district court correctly concluded that the plaintiffs produced no evidence of ‘intentional discrimination'] will depend entirely on the definition of 'intentional discrimination’ within the meaning of Title IX."

. In the first appeal of this case, this Court, relying on Personnel Administrator v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), recognized that discriminatory intent requires a showing that the challenged policy was adopted "because of, not merely in spite of, its adverse impact on persons in the ... class." Horner, 43 F.3d at 276 (citing Feeney, 442 U.S. at 279, 99 S.Ct. 2282) (emphasis added).
Applying this rule, the Homer I panel ruled that:
Plaintiffs did not allege that defendants adopted or adhered to the 25 percent rule because of rather than in spite of its disparate impact on females. Nor did they come forward with evidence of discriminatory intent, such as a tainted historical background of the rule, or a circumstantially suspicious sequence of events leading up to the rule. In short, plaintiffs claimed only that sheer disparate impact was sufficient to demonstrate an equal protection violation. This simply was not enough to defeat the defendants' motion for summary judgment.
Id. (internal citation omitted).

. Title IX provides that “[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance!.]” 20 U.S.C. § 1681(a).

. As we noted in the equal protection context in Horner I:
Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action — whether it "bears more heavily on one race than another,” — may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even though the' governing legislation appears neutral on its fact. The evidentiary inquiry is then relatively easy. But such cases are rare.
Horner I, 43 F.3d at 276 (quoting Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).