MIAMI UNIVERSITY WRESTLING
CLUB, et al., Plaintiffs,

v.

MIAMI UNIVERSITY,
et al., Defendants.

No. C–1–99–972.

United States District Court,
S.D. Ohio,
Western Division.

Jan. 24, 2001.

Robert Raymond Furnier, Todd J. Flagel, Furnier & Thomas, Cincinnati, OH, James S. Wright, Jr., Center for Individual Rights, Washington, DC, Michael Evan Rosman, General Counsel for the Individual Rights, for Plaintiffs.

James Alan Dyer, Jon M. Sebaly, Joseph V. Hatala, Sebaly, Shillito & Dyer, Dayton, OH, Robin Leigh Parker, Miami University General Counsel, Oxford, OH, for Defendants.

*Memorandum and Order*

BECKWITH, District Judge.

Plaintiffs, members of three men's athletic teams disbanded by Miami University, sued the University and various of its officials and trustees for alleged violations

of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 20 U.S.C. §§ 1681, *et seq.*, ("Title IX"). In a March 24, 2000 Memorandum and Order, this Court dismissed Plaintiffs' claims under Title IX, noting that Plaintiffs could not establish liability on the part of the individual Defendants under that statute and holding that they had not asserted a Title IX claim against the University upon which relief could be granted. The Court also dismissed Plaintiffs' equal protection claim against the University on the basis of the immunity afforded to the State of Ohio by the Eleventh Amendment to the United States Constitution. The Court denied the individual Defendants' motion to dismiss Plaintiffs' equal protection claim against them. This matter is now before the Court upon the individual Defendants' motion for summary judgment with respect to that claim (Doc. 36). Plaintiffs' motion for reconsideration of the March 24, 2000 Memorandum and Order (Doc. 45) is also before the Court.

### 1. *Background*

Miami University is a state university of the State of Ohio and receives federal funds. At its meeting on April 16, 1999, the Defendant members of the Board of Trustees of Miami University voted, upon the recommendation of the President of the University and its Athletic Director, who are also Defendants, to eliminate the men's soccer, tennis, and wrestling teams as of the end of the 1998–99 academic year. Prior to that time, the University, through its personnel, had recruited each of the individual Plaintiffs to attend the University and become members of one of those teams. The clubs formed by the members of those disbanded teams are also Plaintiffs in this action.

The University's Board of Trustees voted to eliminate the men's soccer, tennis, and wrestling teams in order to comply with the requirements of Title IX, which requires that federally funded educational institutions provide equal athletic opportunities for men and women. *See* 34 C.F.R. § 106.41(c). Plaintiffs allege, however, that

> Miami has never been advised by the United States Department of Education or the Office of Civil Rights of the Department of Education that its athletic program was or is in violation of Title IX or that its athletic program was under investigation for any possible violation of Title IX.

Amended Complaint, ¶ 35. Plaintiffs further allege that, prior to the elimination of the men's soccer, tennis, and wrestling teams, Miami University was not in violation of Title IX. *See* Amended Complaint, ¶ 36.

Defendants have introduced uncontroverted evidence that demonstrates that in 1993 females constituted 54 percent of the student body at Miami University, while they contributed only 29 percent of the University's student-athletes. While female athletic teams were added between 1993 and 1997, female students, who constituted 55 percent of the University's undergraduate population in 1997, contributed only 42 percent of its student-athletes. The evidence also establishes, unequivocally, that the University spent proportionally more on recruiting male athletes and financial aid to male athletes than in recruiting female athletes and financial aid to female athletes.

In light of those statistics and the unavailability of additional funds to increase athletic opportunities for female students, the University's Athletic Policy Committee concluded that compliance with Title IX required the University to eliminate some athletic opportunities for male students. After considering and rejecting alternatives, Defendant James Garland, the University's President, recommended to the

Board of Trustees that the University eliminate the mens' golf, soccer, tennis, and wrestling teams. After delaying implementation of the recommendation in an attempt to identify other options, the Board of Trustees voted to eliminate the mens' soccer, tennis, and wrestling teams.

The immediate effects of the Board of Trustees' actions were the loss of athletic opportunities for the members of the mens' soccer, tennis, and wrestling teams and an increase in the percentage of the student-athlete population at Miami University that was comprised of female students. During the 1999–2000 academic year, females constituted 55 percent of the University's student body and 53 percent of its student athletes. The University also increased the budget for financial aid to female students by $400,000.

Plaintiffs assert that Defendants' act of eliminating the men's soccer, tennis, and wrestling teams at Miami University violated Plaintiffs' rights under Title IX and deprived them of the equal protection guaranteed by the Fourteenth Amendment to the United States Constitution. In its March 24, 2000 Memorandum and order, the Court concluded that Plaintiffs' allegations did not give rise to a claim under Title IX against the University.

As regards Plaintiffs' equal protection claim against the individual Defendants, the Court observed that Plaintiffs do not have a constitutional right to participate in intercollegiate athletics. *See Horner v.* *Kentucky High School Athletic Ass'n,* 43 F.3d 265, 275 (6th Cir.1994); *Burrows v. Ohio High School Athletic Ass'n,* 891 F.2d 122, 125–26 (6th Cir.1989). Rather, the Court noted, their claim is for intentional discrimination in the provision of athletic opportunities to male students of Miami University. The Court held that, because Plaintiffs allege that Defendants eliminated the men's soccer, tennis, and wrestling teams at Miami University solely because of the sex of the participants, the individual Defendants' actions are subject to scrutiny under the equal protection clause of the Fourteenth Amendment. *See Mississippi University for Women v. Hogan,* 458 U.S. 718, 723, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982).[1]

The Court noted that the individual Defendants' argument for dismissal was premised upon a number of facts that were not alleged by Plaintiffs. The individual Defendants contended, for instance, that they had acted in conformity with Title IX when they determined to eliminate the men's soccer, tennis, and wrestling teams. Plaintiffs had alleged, however, that Defendants' actions were not required by Title IX. Accepting the allegations of the complaint as true, as the Court was required to do in the context of a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court accepted Plaintiffs' allegation that Defendants' actions were not required by Title IX.[2] Accepting that allegation as

1. "The general rule in equal protection analysis is that state action is presumed to be valid and will be sustained if the classification drawn by the state is rationally related to a legitimate state interest." *Valot v. Southeast Local Sch. Dist. Bd. of Educ.,* 107 F.3d 1220, 1229 (6th Cir.) (citing *Schweiker v. Wilson,* 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981)), *cert. denied,* 522 U.S. 861, 118 S.Ct. 164, 139 L.Ed.2d 108 (1997). "Classifications based on gender ... call for review under an intermediate standard and will fail unless substantially related to a sufficiently important government interest." *Id.*

2. The Court noted that, in the event that the individual Defendants were able to prove that their actions were in conformity with Title IX, they would be entitled to judgment with respect to Plaintiffs' equal protection claim, inasmuch as their actions would be substantially related to a legitimate and important governmental objective. *See Hogan,* 458 U.S. at 726, 102 S.Ct. 3331; *Kelley v. Bd. of Trustees,* 35 F.3d 265, 272 (7th Cir.1994), *cert.*

true, the Court concluded that a claim that the individual Defendants' actions were not substantially related to the government interest in providing equal athletic opportunities, which is embodied in Title IX, was implicit in Plaintiffs' complaint. The Court summarized that if the individual Defendants' actions were not taken in service of the government interest of remedying past sex discrimination or eliminating unjustified gender disparities, they may well have violated the Equal Protection Clause of the Fourteenth Amendment. The individual Defendants now seek summary judgment with respect to Plaintiffs' equal protection claim.

Plaintiffs ask the Court to reconsider its March 24, 2000 Memorandum and Order to the extent that the Court granted the University's motion to dismiss Plaintiffs' claim under Title IX. Plaintiffs contend that the Court's decision resulted from the Court's affording substantial deference to the Policy Interpretations of the United States Department of Education. Plaintiffs contend that a May 2000 decision of the United States Supreme Court, *Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), stands for the proposition that those Policy Interpretations are not entitled to substantial deference. They further contend that, were the Court to properly consider the Policy Interpretations in light of *Christensen*, it would disregard them and conclude that the University violated Title IX by considering the gender of the students involved when it implemented the changes to its athletic program in 1999 that resulted in the elimination of Plaintiffs, teams.

### 2. *The Equal Protection Claim*

The individual Defendants contend that they are entitled to summary judgment with respect to Plaintiffs' equal protection claim. They bring their motion under

*denied,* 513 U.S. 1128, 115 S.Ct. 938, 130

Rule 56 of the Federal Rules of Civil Procedure.

#### a. The summary judgment standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom. *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

The Court will not grant summary judgment unless it is clear that a trial is unnecessary. The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.*

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment. *Poller v. Columbia Broadcasting System,*

L.Ed.2d 883 (1995).

*Inc.,* 368 U.S. 464, 472, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). "[T]he issue of material fact required by Rule 56(c) ... to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial." *First National Bank v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, *Smith v. Hudson,* 600 F.2d 60, 63 (6th Cir.), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.* at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. Significantly, the Supreme Court also instructs that the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence. *Id.; Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.*

■■■ Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim. *Id.* Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits." Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

b. Analysis

■■■ The Equal Protection Clause prohibits intentional discrimination. *See Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Discrimination on the basis of sex is permissible, however, when it is substantially related to an important governmental objective. *See Metro Broadcasting. Inc. v. Federal Communications Comm'n,* 497 U.S. 547, 564–65, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (recognizing intermediate standard of scrutiny for sex discrimination); *Hogan,* 458 U.S. at 728, 102 S.Ct. 3331. The elimination of sex discrimination in publicly funded educational institutions is an important governmental objective. *See Kelley,* 35 F.3d at 272 (citing *Hogan,* 458 U.S. at 728, 102 S.Ct. 3331) ("a gender-based classification favoring one sex can be justi-

fied if it intentionally and directly assists members of the sex that is disproportionately burdened."). Considerations of gender in the implementation of the requirements of Title IX do not, by themselves, constitute equal protection violations. *Kelley*, 35 F.3d at 272.

The analysis of the United States Supreme Court in *Hogan, supra,* is of particular assistance to this Court in its consideration of the actions of the individual Defendants in implementing changes to Miami University's athletic program in 1999. In *Hogan,* the Court held that a defender of a state action, the individual Defendants in this case, must demonstrate not only that its action serves an important governmental objective but also that the discriminatory means employed are substantially related to the achievement of that objective. *See Hogan,* 458 U.S. at 724, 102 S.Ct. 3331 (citing *Wengler v. Druggists Mutual Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980)). The court examining a state actor's discriminatory conduct must, therefore, consider whether the state's objective is legitimate and important *and* whether "the requisite direct, substantial relationship between objective and means is present." *Id.* at 725, 102 S.Ct. 3331.

In *Hogan,* the Court concluded that

> [i]n limited circumstances, a gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened.

*Id.* at 728, 102 S.Ct. 3331 (citing *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975)). The " 'mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying' " the classification, however. *Id.* (quoting *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975)). A "searching analysis" is required even when the state's objective is "to balance the burdens borne by males and females." *Id.*

The first element of that analysis is an inquiry whether "the members of the gender benefitted by the classification actually suffer a disadvantage related to the classification." *Id.* For an example of a classification that actually benefitted a disadvantaged gender, the *Hogan* Court cited its own decision in *Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977). In *Califano,* the Court had considered a statutory classification that allowed women to eliminate more low-earning years than men for purposes of computing Social Security retirement benefits. *See Hogan,* 458 U.S. at 728, 102 S.Ct. 3331. The Court held that, although the classification allowed women higher benefits than similarly situated men, it properly took into account the fact that women " 'as such have been unfairly hindered from earning as much as men.' " *Id.* (quoting *Califano,* 430 U.S. at 318, 97 S.Ct. 1192). The Court noted that the classification worked directly to remedy the disparity. *See id.*

The *Hogan* Court distinguished the male/female disparity underlying the classification in *Califano* from that underlying the one before it in which a state university had denied otherwise qualified male applicants admission to its school of nursing. The Court concluded that the admission classification of the Mississippi University for Women did not remedy a disparity resulting from earlier unfair treatment of women but, rather, "perpetuate[d] the stereotyped view of nursing as an exclusively woman's job." *Hogan,* 458 U.S. at 729, 102 S.Ct. 3331. The Court concluded that the classification at issue was not directly related to the underlying objective of providing equal opportunities for women. *See id.* at 730, 102 S.Ct. 3331. The

Court held that it was an impermissible classification.

■ The objective explicitly underlying both Title IX and the challenged actions of the individual Defendants herein is the elimination of the effects of past discrimination against women in publicly funded athletic programs, particularly those administered by public educational institutions. That objective is borne out in the legislative history of Title IX and in the unequivocal evidence of record in this matter.[3] Moreover, as the Court has noted, that objective is an important governmental objective. *See Kelley*, 35 F.3d at 272. The remaining inquiry, therefore, is whether the gender classification in which the individual Defendants engaged "worked directly to remedy the disparity." *Hogan*, 458 U.S. at 728, 102 S.Ct. 3331.

■ The uncontroverted evidence of record in this matter establishes that, prior to Defendants' actions in 1999, female students were not represented among student-athletes at Miami University in a number that approximated their number in the student body at large. Like the female Social Security retirement benefit recipients in *Califano, supra*, female students, as a group, without evidence of their individual histories, were presumed to have been burdened by past discrimination in the provision of publicly funded opportunities. Plaintiffs have offered nothing by way of evidence to rebut that presumption. In short, the evidence of record, including the inferences arising from that evidence, establishes without controversy that Miami University had, prior to 1999, discriminated against females in the funding of its athletic program, including the establishment of athletic teams, the re-

cruitment of athletes, and the provision of financial aid.

Finally, the uncontroverted evidence of record establishes that Defendants' challenged actions were intended to, and did in fact, eliminate some or all of the disparity in the relative participation of male and female Miami University students in athletics. Those actions were, accordingly, substantially and directly related to the underlying important governmental objective and cannot be the basis of a successful equal protection claim by the negatively affected male students. The individual Defendants are, therefore, entitled to summary judgment with respect to Plaintiffs' equal protection claims.

3. The Title IX claim

Perhaps in recognition that they could not prevail on their equal protection claim, Plaintiffs moved, after discovery had closed in this matter, for reconsideration of the portion of the Court's March 24, 2000 Memorandum and Order pursuant to which the Court dismissed the Title IX claim against Miami University. Plaintiffs contend that the Court paid substantial deference to the Department of Education's Policy Interpretations, that *Christensen, supra*, mandates a different treatment of the Policy Interpretations, and that reconsideration is, therefore, warranted.

The Court first notes that its March 24, 2000 decision was premised to some extent upon substantial deference to the Policy Interpretations of the Department of Education. The Court based its decision upon authority from the Sixth Circuit and other Circuits. The Court relied primarily upon the decision of the Court of Appeals for

**3.** Plaintiffs have not identified any other motivating factor or introduced evidence that tends to show that the individual Defendants were motivated by anything other than desire to eliminate the effects of discrimination in the provision of athletic opportunities for women and to comply with Title IX.

the Sixth Circuit in *Horner,* 43 F.3d 265 (6th Cir.1994).

The *Horner* court considered the Policy Interpretations at length and did not accept those Interpretations as a statement of the law. Rather, the court concluded that the Policy Interpretations draw their essence from Title IX and stand upon a plausible reading of the Statute. *See id.* at 274–75. That court did suggest, however, that the Policy Interpretations were entitled to substantial deference. *See id.* at 273.

Plaintiffs argue that, under *Christensen,* 120 S.Ct. at 1663, the policy interpretations of federal executive agencies are entitled to " 'respect' " only to the extent that their reasoning has " 'power to persuade.' " (Quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). The Court notes, however, that the *Christensen* Court did not address all policy interpretations by federal agencies. Rather, it confined its attention to those "interpretation[s] contained in an opinion letter, not one arrived at after, for example, a formal adjudication and notice-and-comment rulemaking." *Id.* at 1662.

As .Defendants have argued, Plaintiffs have not attempted to establish that the Department of Education's Policy Interpretations of Title IX are of the type considered by the Supreme Court in *Christensen.* The applicability of the *Christensen* Court's reasoning to the Policy Interpretations in question here is not self-evident. Even were this Court to assume that the Policy Interpretations are entitled only to "respect" and then only to the extent that their reasoning has "power to persuade," however, the disposition of Plaintiffs' claim under Title IX would be the same.

■■■■■ Classification on the basis of gender is not a *per se* violation of Title IX. *See Horner v. Kentucky High School Athletic Ass'n,* 206 F.3d 685, 697 (6th Cir.) ("*Horner II* "), *cert. denied,* 531 U.S. 824,

121 S.Ct. 69, 148 L.Ed.2d 34 (2000). Accordingly, Plaintiffs cannot make out a claim under Title IX simply on the basis of the individual Defendants' consideration of gender in making the 1999 changes to Miami University's athletic program. The allegations in Plaintiffs' complaint stop there, however, and, therefore, do not support a claim under Title IX.

The Court of Appeals noted in its *Horner II* decision that Title IX does not require strict gender parity but rather the equal accommodation of interest by male and female students in athletic participation and opportunities. *See id.* at 696–97. In order, to state a claim under Title IX, therefore, a plaintiff must allege that an institution receiving public funding has failed to provide equal athletic opportunities by gender. *See id.;* 20 U.S.C. § 1681(b). Plaintiffs make no such allegation. Accordingly, they have failed to state a claim under Title IX. That conclusion does not depend in any fashion upon the Department of Education's Policy Interpretations. Accordingly, the Court reaches the same conclusion regarding Plaintiffs' Title IX claim against Miami University whether or not it affords substantial deference to the Policy Interpretations of the Department of Education.

If the Court were to apply the *Christensen* Court's reasoning to the Policy Interpretations at issue in this matter, it would, nevertheless, give significant weight to the Policy Interpretations out of respect for the persuasive power of the reasoning underlying them. Plaintiffs urge the Court to look beyond bare numerical proportionality and to consider the relative abilities and interests of male and female students. Indeed, equal accommodation of the athletic abilities and interests of the sexes ought to be the ultimate objective of any program or policy related to athletic opportunities at publicly funded institutions.

The difficulty lies in the attempt to separate the effects of past discrimination in the provision of athletic opportunities from differences in ability and interest between the sexes. At Miami University at the time when Plaintiffs filed their complaint in this matter, for example, the interest of male students in athletic participation was inflated by the fact that many members of the three disbanded male teams remained in the student body. Calculations of relative interest in athletic participation will often be skewed by imbalances in the number of students recruited to the institution specifically for their athletic ability and interest.

The most obvious method of accounting for the skewing effect of an imbalance caused by disparities in opportunities currently available is to provide equal opportunities on the basis of numerical proportionality and then to consider lingering interest among non-participating students when making future decisions regarding the provision of athletic opportunities. Once approximate numerical proportionality is attained, the institution can determine, by canvassing non-participating students what the relative interest in athletic participation is by gender. When the institution offers future athletic opportunities, it can accommodate those interests without maintaining strict numerical proportionality and with the assurance that the effects of past discrimination, at least at the institution itself, do not continue to burden one sex or the other. Likewise, if a team is disbanded due to lack of interest, the institution can replace that team by considering interest among current non-participating students without having to consider the gender composition of the disbanded team.

While decisions based solely upon the relative interests and abilities of students is desirable, they are very likely impossible without some consideration, at least initially, of numerical proportionality. Accordingly, the Court concludes that persuasive reasoning supports the Policy Interpretations' focus on numerical proportionality and that those interpretations are entitled to respect. For all of those reasons, Plaintiffs' motion for reconsideration of this Court's March 24, 2000 Memorandum and Order (Doc. 45) is not well-taken.

### 4. *Conclusion*

For the reasons set forth herein, the individual Defendants' motion for summary judgment with respect to Plaintiffs' equal protection claim (Doc. 36) is hereby **GRANTED.** Plaintiffs' motion for reconsideration of the Court's March 24, 2000 Memorandum and Order (Doc. 45) is **DENIED.** All other pending motions are **DENIED** as moot, and this action is **CLOSED.**

**IT IS SO ORDERED.**